26 P.3d 572

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Gilbert PACHECO, Defendant–Appellant.**

No. 23152.

Supreme Court of Hawai'i.

June 6, 2001.

Reconsideration Denied July 24, 2001.

Dwight C.H. Lum, on the briefs, for the defendant-appellant, Gilbert Pacheco.

James M. Anderson (Deputy Prosecuting Attorney), on the briefs, for the plaintiff-appellee, State of Hawai'i.

MOON, C.J., LEVINSON, NAKAYAMA, RAMIL, and ACOBA, JJ.

Amended Opinion of the Court By
LEVINSON, J.

The defendant-appellant Gilbert Pacheco appeals from the judgment of the first circuit court, the Honorable Victoria Marks presiding, convicting him of and sentencing him for the offenses of escape in the second degree, in violation of Hawai'i Revised Statutes (HRS) § 710–1021 (1993),[1] and drinking in a public park, in violation of Revised Ordinances of Honolulu (ROH) § 40–1.2(a) (1991).[2] On appeal, Pacheco claims that prosecutorial misconduct tainted his jury trial and, thus, warrants reversal of the circuit court's judgment of conviction and sentence;[3] Pacheco further urges that the deputy prosecuting attorney's (DPA's) misconduct was so egregious that principles of double jeopardy[4]

---

1. HRS § 710–1021 provides that "[a] person commits the offense of escape in the second degree if the person intentionally escapes from a correctional or detention facility or from custody."

2. ROH § 40–1.2(a) provides in relevant part that "[n]o person shall drink, offer or display to public view in any public park ... any intoxicating liquor, whether in a bottle, demijohn, jug, container or otherwise."

3. In his opening brief, Pacheco does not particularize the conviction or convictions he is challenging; inasmuch, however, as he admits that he committed the "drinking in a public park" offense and does not advance any argument tai-

lored to that offense, we construe his appeal as contesting only his conviction of and sentence for escape in the second degree. In any event, his admission of guilt renders harmless, as to his conviction of the offense of drinking in a public park, the errors that we hold are reversible as to his conviction of the offense of second degree escape.

4. The fifth amendment to the United States Constitution provides in relevant part that "[n]o person ... shall ... be subject for the same offense to be twice put in jeopardy of life or limb[.]" Article I, section 10 of the Hawai'i Constitution (1982) provides in relevant part that "[n]o person ... shall ... be subject for the same offense to be twice put in jeopardy[.]"

preclude retrial, *see State v. Rogan*, 91 Hawai'i 405, 984 P.2d 1231 (1999). Alternatively, Pacheco asserts that he is entitled to a new trial (1) because his trial counsel was ineffective or (2) because the circuit court erred in permitting the prosecution to adduce evidence regarding Pacheco's prior conviction of a theft offense.

We agree that the DPA's misconduct warrants vacating Pacheco's conviction of second degree escape; however, because we do not agree that the "exceptional circumstances" contemplated in *Rogan* are· present in this case such that the DPA's misconduct rose to the level of "egregiousness" that would bar reprosecution, we remand the matter for a new trial on the offense of second degree escape. In order to provide guidance to the circuit court and the parties on remand, *cf. State v. Davia*, 87 Hawai'i 249, 252, 953 P.2d 1347, 1350 (1998), we address Pacheco's claims that the circuit court erroneously admitted evidence regarding his prior conviction for impeachment purposes, *see infra* section III.B., and that his trial counsel rendered ineffective assistance, *see infra* section III.C. Finally, we resolve a latent ambiguity in the statute·setting forth the choice of evils defense and instruct that, if evidence supporting the defense is adduced at trial on remand, Pacheco is entitled to an instruction on the generic choice of evils defense set forth in HRS § 703–302(1) (1993), *see infra* section III.D.

We vacate Pacheco's conviction of and sentence for the offense of escape in the second degree and remand this matter for a new trial. We affirm Pacheco's conviction of and sentence for the offense of drinking in a public park, *see supra* note 3.

## I. BACKGROUND

During the afternoon of July 21, 1999 Pacheco was drinking beer with Edgar Mamalias in 'A'ala Park, in the City and County of Honolulu. At approximately 2:00 p.m. that afternoon, Pacheco was arrested by Honolulu Police Department (HPD) Officer Hyong Kim for drinking in a public park. Officer

Kim handcuffed Pacheco and had him sit down on a park bench. Meanwhile, HPD Officer Tara Amuimuia, who had initially approached Pacheco and Mamalias with Officer Kim, was citing Mamalias for the same offense.

Before Officer Kim handcuffed Pacheco, HPD Officer Daniel Sellers arrived and provided "cover." Shortly after· Pacheco was handcuffed, Mamalias became boisterous; consequently, Officer Kim's attention was diverted from Pacheco as he assisted Officer Amuimuia in calming Mamalias. A "minute" later, Officers Kim and Amuimuia noticed that Pacheco was running towards a short two-foot wall, bordering the park approximately fifty feet away. Pacheco leapt over the wall and into Nu'uanu stream, wherein he swam, still handcuffed, in circles, like a "porpoise," for approximately forty-five minutes until the Honolulu Fire Department (HFD) Rescue Unit managed to extract him, with some difficulty due to his resistence, from the water.

Prior to trial, Pacheco filed a motion *in limine* that sought exclusion at trial of any evidence, *inter alia*, regarding his prior criminal convictions. Nevertheless, at a hearing convened in connection with the motion, Pacheco indicated that he intended to adduce testimony regarding a prior incident between himself and Officer Sellers, which, as it happened, had resulted in his arrest for and subsequent conviction of a theft offense,[5] which both the prosecution and Pacheco characterized as "shoplifting" from, according to the prosecution, a "church." The prosecution suggested that, if Pacheco were to adduce any testimony concerning the prior incident, he would then have "open[ed] the door" for the prosecution to establish that he had been arrested and convicted as a result. The circuit court agreed with the prosecution and ruled that, if Pacheco adduced testimony regarding the prior incident, "the prosecution can then indicate that it was a prior arrest for a criminal offense." In response to the prosecution's inquiry regarding whether it could invoke the theft offense to impeach

---

5. It is unclear from the record whether the incident resulted in a conviction of theft in the third degree, pursuant to HRS § 708–832 (1993) or

theft in the fourth degree, pursuant to HRS § 708–833 (1993). The distinction is immaterial to our analysis *infra* in section III.B.

Pacheco's credibility as a witness, the circuit court deferred any ruling.

After further investigation, the prosecution subsequently represented to the circuit court that Pacheco had been previously arrested for and convicted of numerous third and fourth degree theft offenses and argued that they were all "crimes of moral turpitude." As such, the prosecution maintained that it believed, "[s]hould [Pacheco] take the stand," that it was "entitled to cross-examine him on these theft offenses as they are crimes of moral turpitude, and the jurors should have that knowledge to weigh the credibility of his testimony." Pacheco objected, arguing that the prior petty theft offenses were not crimes of moral turpitude or dishonesty "in the same sense [as] something like forgery or fraud or perjury" and contending that evidence of these prior offenses should be precluded, notwithstanding that Pacheco would be testifying about the prior encounter he had had with Officer Sellers. The circuit court again deferred ruling on whether evidence of the prior offense would be admissible for impeachment purposes, but indicated that its "inclination" was to admit it; the circuit court then requested memoranda of law on the issue from both parties.[6]

Subsequently, the DPA, after consulting with the head of his appellate division, represented to the circuit court that it did not find any authority for either party's position. Pacheco maintained that, unless he affirmatively testified as to his "good" or "trustworthy" character, the evidence regarding the prior offenses was not admissible for impeachment purposes, even if the prior offenses constituted crimes of dishonesty. The following day, the circuit court ruled, pursuant to Hawai'i Rules of Evidence (HRE) Rule 609 (1993),[7] that

the prosecution may go into the arrest and conviction associated with the event that

[Pacheco] had with the police officer which preceded the alleged incidents in this case. No other prior convictions should be gone into. And when I say "gone into," you can refer to an arrest and conviction. You can refer to it as theft. You can refer to it as shoplifting.

. . . .

... I think under [HRE] Rule 609, the prior conviction can be gone into which means name of the offense, date of the offense, the conviction, possible sentence; but I think we have a problem because we're not sure which particular event we're talking about.

So my ruling at this point is that the prosecution could get into the fact that he was arrested. That the arrest was either for theft or shoplifting. We don't need to specify in what degree, and that he was convicted of the offense.

The DPA inquired, "Can I make reference to shoplifting being a theft or—excuse me—a crime of dishonesty?" The circuit court ruled that he could not. The DPA nonetheless persisted, "May I refer to that as part of my closing argument?" The circuit court clarified that it did not "want [the DPA] using that term of art that appears in the Rules of Evidence." The DPA responded, "So understood."

In his opening statement, defense counsel conceded that Pacheco was guilty of the offense of drinking in a public park, but asserted that he was not guilty of the second degree escape charge, because, due to a prior "run-in" with Officer Sellers, during which the officer had threatened Pacheco, Pacheco's flight was not prompted by an intent to escape but, rather, by an intent to separate himself from Officer Sellers so as to avoid being assaulted. Defense counsel also informed the jury that Pacheco had been "ar-

---

6. The record does not reflect that either party filed the requested legal memoranda.

7. HRE Rule 609 provides in relevant part:

**Impeachment by evidence of conviction of crime.** (a) General rule. For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime is inadmissible except when the crime is one involving dishonesty. However, in a criminal case

where the defendant takes the stand, the defendant shall not be questioned or evidence introduced as to whether the defendant has been convicted of a crime, for the sole purpose of attacking credibility, unless the defendant has oneself introduced testimony for the purpose of establishing the defendant's credibility as a witness, in which case the defendant shall be treated as any other witness as provided by this rule.

rested for a shoplifting" offense as a result of his prior encounter with Officer Sellers.

During direct examination, Officer Sellers testified that he had "seen" Pacheco before July 21, 1999, but had not, "[a]t any time in the past leading up to July 21, 1999," "hit," "str[uc]k," "shove[d]," "push[ed]," or "abuse[d]" him. On cross-examination, Pacheco adduced the following testimony from Officer Sellers:

Q. Now, Officer Sellers, you had a prior run-in, so-to-speak, with Mr. Pacheco on a theft type case, right?

A. Yes, I did.

Q. You recall that?

A. Yes, I do.

Q. That occurred around November of 1998.

A. I'm not too sure what the date is, but I vividly remember the case, yes.

Q. You remember having I guess a bad experience with him?

A. No, I did not.

Q. It didn't stick out in your mind like that?

A. No, it did not.

Q. Do you remember on that date telling him that if I see you again, I will arrest you even if I have to make up a charge?

A. No, I did not.

Q. Do you remember telling him that if you see him again, that you'll take him down?

A. No, I did not.

Q. Nothing like that.

A. Nothing at all.

On redirect examination, Officer Sellers testified that Pacheco had been convicted as a result of his prior "run-in" with Officer Sellers:

Q. You had earlier talked about or defense counsel asked you certain questions about an alleged threat to the Defendant. Have you ever threatened this Defendant before?

A. No, I did not.

Q. Going back to the theft arrest, that resulted in a theft conviction for this Defendant; isn't that true?

A. Yes.

Pacheco's counsel did not object to the DPA's questions of Officer Sellers regarding Pacheco's prior conviction. The DPA then turned to the incident giving rise to Pacheco's arrest in the present matter and inquired of Officer Sellers:

Q. Going back to the initial arrest of this Defendant for drinking beer in public offense or in a public park offense, are you familiar, sir, with the term weed and seed?

A. Yes.

Q. Is the Aala Park area within the weed and seed area?

Pacheco's counsel, at this point, objected to the question, and the circuit court sustained the objection. The DPA returned, once more, to the circumstances under which Pacheco was previously arrested by Officer Sellers as follows:

Q. At the time you arrested this Defendant, Gilbert Pacheco, for the theft offense, did he give you any problems in being arrested?

A. At that time that I can remember, no.

Q. Did you threaten him or give him any problems when you arrested him?

A. No, I did not.

Again, defense counsel failed to object. and, indeed, during recross-examination of Officer Sellers, adduced further testimony from Officer Sellers regarding Pacheco's prior theft conviction, specifically, that, as far as Officer Sellers was aware, Pacheco had "pled" to the prior offense and that he did not recall having to attend a trial.

During his own testimony, Pacheco recalled his prior "run-in" with Officer Sellers as follows:

Well, he was the arresting officer; and as embarrassing as it is, at the end of our encounter, he did tell me that if he ever see me again, that he was going to arrest me even if he had to make up a charge. And he said another comment in the lines of he was going to take me down if he saw me.

Pacheco asserted that, when Officer Sellers was threatening him during the prior inci-

dent, he "felt intimidated" and that he took the officer's "threat[s]" as "a stern warning to watch" himself. Pacheco confirmed that the prior incident resulted in his arrest and conviction and that he did not go to trial on the matter but, rather, "was guilty and . . . admitted it." Pacheco also admitted to "drinking a beer" in ʻAʻala Park on the afternoon of July 21, 1998.

With regard to Officer Sellers's demeanor during the arrest on July 21, 1999, giving rise to the present matter, Pacheco testified:

> Officer Sellers rode up on his bicycle, and he said, "That's Gilbert Pacheco. Are you still working at the Hot Lava Café"? And I was wondering how in the heck he knew this because the last time I encountered him I wasn't working there, and I was in fear. I mean I didn't know what was going on. I went from kind of nervous into concerned to fearful of this man.
>
> . . . .
>
> [Officer Seller's demeanor was v]ery aggressive, very aggressive. . . . He jumped off his bike. He came up to me on the bench, and this officer towered over me. I mean he's very big, very large man. And he told me to stand up; and when I stood up, he pushed me back into the bench. And he told me—and I'll quote—that I'm going to kick your ass.
>
> . . . .
>
> To me he looked like a monster.

In "fear of [his] life," Pacheco testified that he "ran across [the park] to safety" and that he jumped the two-foot bordering wall and into Nuʻuanu stream in order to "separate" himself from Officer Sellers. Pacheco asserted that "at no point was the thought for me to escape from them [or] to go anywhere. They had my wallet with my I.D., on an island, I don't have money, you know, I don't get the logic in it to escape." Indeed, Pacheco asserted, he "didn't try to run away" and, moreover, testified that he "felt relieved from that point of separation from this one officer, but [the first] two officers were fine. . . . [I]t was not a problem until this other guy came up." Pacheco denied that, while in the water, he had stated, "You're not going to arrest me."

On cross-examination, the DPA asked Pacheco numerous questions regarding his lack of cooperation with the HPD and HFD officers, culminating with the question, "The reason why you did not cooperate with the fireman is because you were being an asshole, right?" Without explanation, the circuit court overruled defense counsel's objection, and Pacheco responded, "No, Sir, I wasn't being an a-s-s-h-o-l-e."

In response to the DPA's questions regarding his failure to file a formal complaint against Officer Sellers, Pacheco testified that he was not aware of the "proper channels" to do so. The DPA then queried, "You want to bamboozle this jury into believing your side of the story, isn't that true?" Pacheco responded, "No, sir. I believe that both sides have a perspective and have truth to them; and, unfortunately, some things were left out of the other testimonies." The DPA returned to the same question moments later, this time adding that Pacheco "want[ed] to bamboozle this jury into believing your story so you can beat the ra[p]," which prompted the following exchange:

A. That's not true, sir.

Q. Why should this jury, all of these jurors, believe a thief like you?

MR. LEE HAYAKAWA [ (DPD)]: Objection, Your Honor. Calls for speculation. It's improper.

[THE COURT]: Sustained.

Pacheco's counsel thanked the circuit court for sustaining his objection but neither requested a curative instruction admonishing the jury to disregard the question and to refrain from any speculation as to what the answer might have been nor moved for a mistrial.

While the evidentiary phase of the trial was still in progress and after Pacheco had testified, jury instructions were settled. Pacheco's counsel submitted a proposed choice of evils instruction, predicated on HRS § 703–302(1), *see infra* section III.D. Defense counsel also submitted a proposed instruction on the defense of duress, predicated on HRS § 702–231 (1993), *see infra* section III.D. During the settling of jury instructions, the following colloquy transpired regarding the proposed choice of evils instruc-

tion submitted by defense counsel, which was engendered by the fact that HRS § 703–302(3) (1993), *see infra* section III.D., sets forth an affirmative choice of evils defense, distinct from the generic choice of evils defense set forth in HRS § 703–302(1), applicable to the offense of escape in the first or second degrees:

> MR. HAYAKAWA: I just recalled that my choice of evils instruction, Mr. Uehara (the DPA) did ask me if that tracked the HAWJIC language. And actually come to think of it, I know that there are two versions on our computer at our office. And so actually in good conscience, I can't say I am certain that it tracks the HAWJIC language.
>
> THE COURT: We'll check. Let's go off the record.
>
> . . . .
>
> THE COURT: We're back on the record. In terms of Defendant's [choice of evils instruction], the Court and counsel have reviewed the most recent HAWJIC jury instructions; and based on 7.11, choice of evils escape, which does not quite track what you had proposed, what would you like to do?
>
> MR. HAYAKAWA: Your Honor, I'd like to at this time move to withdraw that particular instruction.
>
> THE COURT: Do you want the Court to give the 7.11, choice of evils escape instructions?
>
> MR. HAYAKAWA: No, Your Honor.

During closing arguments, the prosecution's theme was that Pacheco's testimony regarding Officer Sellers's threats and demeanor during the prior incident and on July 21, 1999 "doesn't ring true" and did not "make sense." With regard to the prior

incident involving Pacheco and Officer Sellers, the DPA remarked:

> You heard the defendant admit that he was convicted of a theft offense. A theft offense is a crime of dishonesty. You can be convicted, say[,] of an assault offense. You get mad at somebody, you punch them out; that is not a crime of dishonesty. You can get convicted of threatening to kill somebody. Road rage, somebody cuts in front of you, you get out of your car at a stop sign, you tell them don't you ever do that again or I'm going to kill you. Terroristic threatening, is that a crime of dishonesty? No, but theft is.
>
> Is there any reason for you to believe the testimony of a convicted thief? I submit to you, there is no reason for you to believe the testimony of a convicted thief.

Defense counsel did not object to the prosecution's remarks during closing argument.

In his own closing argument, defense counsel conceded that Pacheco was guilty of the offense of drinking in a public park but, as to the charge of second degree escape, argued that Pacheco lacked the requisite intent to escape when he fled from Officer Sellers,[8] that Pacheco was a credible witness, and that, in any event, he had acted, in jumping into the stream, under "duress." With regard to the prosecution's observations that Pacheco was initially uncooperative with Officers Kim and Sellers, defense counsel remarked:

> The State wants you to think that this guy was just being an asshole, he was just being a terrible person. And maybe if the State can get you to dislike this guy, then maybe you'll convict him. But you'll convict him of a crime he didn't commit.

In connection with the prosecution's claim that, as a convicted thief, Pacheco was not a

---

8. Indeed, defense counsel commenced his closing argument as follows:

> You hear a story about a man that is apprehended by the police and he's handcuffed behind his back. And the story continues. He jumps into Nuuanu Stream handcuffed, and then he is observed swimming circles, he's making circles pretty comfortably on his back, and he's swimming quite well, and it's such a bizarre story that if you didn't laugh, you at least wanted to laugh.

> Why would he do such a strange thing? Why would he jump in the water? Why would he jump in such disgusting water? Why would he jump in such disgusting water handcuffed? I mean, why didn't he run to Hotel Street, or why didn't he run to Beretania Street, or why didn't he head Ewa into Aala Park? Why didn't he head somewhere near King Street? And the simple answer is, he didn't because he wasn't trying to escape. He was merely trying to get to a safe place away from Officer Sellers.

credible witness, defense counsel argued that the prosecution

> may tell you that this is a convicted thief you have before you, so, number one[,] he's a liar; and number two, that makes him more likely to have committed this escape.
>
> Now, logically, ladies and gentlemen, a person perhaps goes into a store, conceals a pen and leaves the store with it. Does that make him a person who's more likely to commit an escape? Does that make him a person who is more likely to take the stand and lie?

In rebuttal argument, the DPA recapitulated Pacheco's uncooperativeness with the HPD and HFD: "Everybody that wanted to help him, this defendant spit at, he kicked at. He was totally uncooperative. He was being an asshole. And that explains his actions." Moments later, the DPA asserted that "there was no [police] brutality on this day, July 21, 1999," and again remarked, "but there was this defendant, who was being an asshole." Pacheco's counsel did not object during the DPA's rebuttal argument.

On the afternoon of November 8, 1999, the jury retired to deliberate. The following morning, on November 9, 1999, the jury sent a communication to the circuit court, which stated: "We seem to be at a stalemate with the problem of intent. It seems there will be no movement. What do we do next?" The circuit court, with the agreement of both Pacheco and the prosecution, inquired of the jury, "Will continued deliberation assist you in reaching a verdict?" Approximately half an hour after receiving the circuit court's inquiry, the jury communicated to the court that it had reached a verdict, and, at noon, rendered its verdict finding Pacheco guilty of the charged offenses.

## II. STANDARDS OF REVIEW

### A. Prosecutorial Misconduct

 Allegations of prosecutorial misconduct are reviewed under the harmless beyond a reasonable doubt standard, which requires an examination of the record and a determination of "whether there is a reasonable possibility that the error complained of might have contributed to the conviction." State v. Balisbisana, 83 Ha-

wai'i 109, 114, 924 P.2d 1215, 1220 (1996) (quoting State v. Holbron, 80 Hawai'i 27, 32, 904 P.2d 912, 917, reconsideration denied, 80 Hawai'i 187, 907 P.2d 773 (1995)) (citations and internal quotation marks omitted); see also State v. Sanchez, 82 Hawai'i 517, 528, 923 P.2d 934, 945 (App.), cert. denied, 84 Hawai'i 127, 930 P.2d 1015 (1996) (citations omitted). Factors to consider are: (1) the nature of the conduct; (2) the promptness of a curative instruction; and (3) the strength or weakness of the evidence against the defendant. State v. Samuel, 74 Haw. 141, 148, 838 P.2d 1374, 1378 (1992) (citation omitted).

State v. Rogan, 91 Hawai'i 405, 412, 984 P.2d 1231, 1238 (1999) (quoting State v. Sawyer, 88 Hawai'i 325, 329 n. 6, 966 P.2d 637, 641 n. 6 (1998)). Moreover, under the double jeopardy clause of the Hawai'i Constitution, see supra note 4, "reprosecution is barred where, in the face of egregious prosecutorial misconduct, it cannot be said beyond a reasonable doubt that the defendant received a fair trial." Rogan, 91 Hawai'i at 423 & n. 11, 984 P.2d at 1249 & n. 11.

### B. Ineffective Assistance Of Counsel

 In assessing claims of ineffective assistance of counsel, the applicable standard is whether, "viewed as a whole, the assistance provided [was] 'within the range of competence demanded of attorneys in criminal cases.'" State v. Antone, 62 Haw. 346, 348, 615 P.2d 101, 104 (1980) (citation omitted).

> General claims of ineffectiveness are insufficient and every action or omission is not subject to inquiry. Specific actions or omissions alleged to be error but which had an obvious tactical basis for benefitting the defendant's case will not be subject to further scrutiny. If, however, the action or omission had no obvious basis for benefitting the defendant's case and it "resulted in the withdrawal or substantial impairment of a potentially meritorious defense," then [it] . . . will be evaluated as . . . information that . . . an ordinary competent criminal attorney should have had.

94

*Briones v. State,* 74 Haw. 442, 462–63, 848 P.2d 966, 976 (1993) (emphasis in original) (internal citations omitted). The burden of establishing ineffective assistance rests with the [defendant] and can only be met by demonstrating specific errors or omissions resulted in the withdrawal or substantial impairment of a meritorious defense. *State v. Smith,* 68 Haw. 304, 309, 712 P.2d 496, 500 (1986).

"Determining whether a defense is 'potentially meritorious' requires an evaluation of the possible, rather than the probable, effect of the defense on the decision maker.... Accordingly, no showing of 'actual' prejudice is required to prove ineffective assistance of counsel." *Briones,* 74 Haw. at 464, 848 P.2d at 977 (citing *State v. Aplaca,* 74 Haw. 54, 73, 837 P.2d 1298, 1308 (1992)).

*Dan v. State,* 76 Hawai'i 423, 427, 879 P.2d 528, 533 (1994) (some brackets added and some in original).

### C. *Admissibility Of Evidence*

█ "[D]ifferent standards of review must be applied to trial court decisions regarding the admissibility of evidence, depending on the requirements of the particular rule of evidence at issue." *State v. Arceo,* 84 Hawai'i 1, 11, 928 P.2d 843, 853 (1996) (citations omitted) (brackets in original). Inasmuch as the commentary to HRE Rule 609 states that the "discretionary balance" of HRE Rule 403 (1993) [9] "governs admissibility under" HRE Rule 609(a), *see supra* note 7, a trial court's ruling with respect to the admissibility of a witness's prior conviction for impeachment purposes is reviewed for an abuse of discretion. *See, e.g., State v. Pudiquet,* 82 Hawai'i 419, 426–27, 922 P.2d 1032, 1039–40 (App.), *cert. denied,* 82 Hawai'i 360, 922 P.2d 973 (1996) (reviewing application of HRE Rule 609 for abuse of discretion); *see also Asato v. Furtado,* 52 Haw. 284, 292–95, 474 P.2d 288, 295–96 (1970) (reviewing admissibility, under precursor to HRE Rule 609, of prior conviction for impeachment purposes for abuse of discretion). An abuse of discretion will be

found where the trial court "clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant." *Arceo,* 84 Hawai'i at 11, 928 P.2d at 853 (citations omitted and internal quotation signals omitted).

### D. *Statutory Interpretation*

█ "[T]he interpretation of a statute.... is a question of law reviewable de novo." ... *Arceo,* 84 Hawai'i [at] 10, 928 P.2d [at] 852[.] ...

*Gray v. Administrative Director of the Court,* 84 Hawai'i 138, 144, 931 P.2d 580, 586 (1997) (some brackets added and some in original). *See also State v. Soto,* 84 Hawai'i 229, 236, 933 P.2d 66, 73 (1997). Furthermore, our statutory construction is guided by established rules:

When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists....

In construing an ambiguous statute, "[t]he meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning." HRS § 1–15(1) [ (1993) ]. Moreover, the courts may resort to extrinsic aids in determining legislative intent. One avenue is the use of legislative history as an interpretive tool.

*Gray,* 84 Hawai'i at 148, 931 P.2d at 590 (quoting ... *Toyomura,* 80 Hawai'i [at] 18–19, 904 P.2d [at] 903–04 ... ) (brackets

---

9. HRE Rule 403 provides that, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or

misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

and ellipsis points in original) (footnote omitted). This court may also consider "[t]he reason and spirit of the law, and the cause which induced the legislature to enact it ... to discover its true meaning." HRS § 1–15(2) (1993). "Laws *in pari materia*, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called upon in aid to explain what is doubtful in another." HRS § 1–16 (1993).

*State v. Valentine*, 93 Hawai'i 199, 204–205, 998 P.2d 479, 484–85 (2000) (some citations omitted) (some ellipsis points and brackets added and some in original).

### E. *Plain Error*

■ "We may recognize plain error when the error committed affects substantial rights of the defendant." *State v. Cullen*, 86 Hawai'i 1, 8, 946 P.2d 955, 962 (1997) (citations and internal quotation signals omitted). *See also* Hawai'i Rules of Penal Procedure (HRPP) Rule 52(b) (1993) ("Plain error or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.").

*State v. Jenkins*, 93 Hawai'i 87, 101, 997 P.2d 13, 27 (2000) (some citations omitted).

### III. *DISCUSSION*

#### A. *Prosecutorial Misconduct*

■ In assessing whether prosecutorial misconduct warrants a new trial, we consider three factors, namely, (1) the nature of the prosecution's conduct, (2) the promptness of a curative instruction (if any) to the jury, and (3) the strength of the evidence against the defendant. *See Rogan*, 91 Hawai'i at 412, 984 P.2d at 1238. If "there is a reasonable possibility that the [prosecutorial] misconduct complained of might have contributed to the [defendant's] conviction," then the misconduct is not harmless beyond a reasonable doubt and the defendant is entitled to a new trial. *Id.* at 412, 423 n. 11, 984 P.2d at 1238, 1249 n. 11 (citations omitted).

#### 1. *Pacheco as "asshole"*

■ On appeal, the prosecution concedes, as it must, that the DPA's choice of epithets to describe Pacheco's conduct on the day of the alleged offense was improper, although it maintains that the DPA's personal denigrations of Pacheco amounted to no more than "colloquialisms" and, thus, were harmless beyond a reasonable doubt. We disagree with the prosecution's assessment of the trial prosecutor's disparaging remarks.

Regarding the first factor, the DPA's characterization of Pacheco as an "asshole" strongly conveyed his personal opinion and could only have been calculated to inflame the passions of the jurors and to divert them, by injecting an issue wholly unrelated to Pacheco's guilt or innocence into their deliberations, from their duty to decide the case on the evidence. *See, e.g., Rogan*, 91 Hawai'i at 412–15, 984 P.2d at 1238–41 (prosecution's appeal to racial prejudice and implied invitation to sympathize with complainant's mother improperly injected issue of defendant's race, constituted emotional appeal that could have inflamed the jury's passions and prejudices, was immaterial to the evidence concerning his guilt or innocence, and, thus, constituted egregious misconduct that denied defendant a fair trial); *State v. Marsh*, 68 Haw. 659, 660–62, 728 P.2d 1301, 1301–03 (1986) (prosecutor's expression of personal opinion as to defendant's guilt and credibility of witnesses warranted reversal and new trial); *see also Dandridge v. State*, 292 Ark. 40, 727 S.W.2d 851 (1987) (reference to defendant as a "gross animal" improper; however, prosecutor's misconduct cured by prompt instruction to the jury); *State v. Lockhart*, 24 Kan.App.2d 488, 947 P.2d 461, 464–65, *cert. denied*, (Dec. 23, 1997) ("[t]rials cannot be allowed to degenerate into name-calling contests"; prosecution's assertion that defendant and defense counsel had "lied" and were "liars" denied defendant a fair trial; new trial warranted); *Bridgeforth v. State*, 498 So.2d 796 (Miss.1986) ("prosecutor should not indulge in personal abuse or vilification of the defendant"; remark that, "If I thought I could stand on my head and that would convince you to get this scum off the street, I'd do it," lacked any justification and constituted prosecutorial misconduct; remanded for new trial on other grounds); *Commonwealth v. Scarfo*, 416 Pa.Super. 329,

611 A.2d 242, 282–84 (1992) (prosecutor's reference to defendants as "wolves,", "a wolf pack," and "the pack," denied defendant a fair trial; remanded for new trial), *superseded by statute on other grounds as stated in, Commonwealth v. Buck,* 551 Pa. 184, 709 A.2d 892, 895 (1998); *State v. Rose,* 62 Wash.2d 309, 382 P.2d 513 (1963) (*en banc*) (prosecutor's remark that defendant was a "drunken homosexual" denied defendant a fair trial; remanded for new trial).

Regarding the second factor, the circuit court gave no curative instructions to the jury. Indeed, when the DPA first characterized Pacheco as an "asshole" during his cross-examination of him, the circuit court overruled defense counsel's objection. *See, e.g., Rogan,* 91 Hawai'i at 415, 984 P.2d at 1241 (failure to sustain defendant's objection and, consequently, lack of curative instruction weighed heavily in favor of conclusion that prosecutorial misconduct was not harmless beyond a reasonable doubt). Moreover, by overruling defense counsel's objection, the circuit court, at least tacitly, placed its imprimatur upon the DPA's characterization of Pacheco, thereby risking the implication that it, too, believed that Pacheco was an "asshole" and inviting the jury to share in that belief.

Finally, with regard to the third factor, we observe that whether the prosecution succeeded in establishing that Pacheco possessed the requisite state of mind at the time he fled from Officer Sellers, *see infra,* hinged entirely upon whether the jury believed or disbelieved Pacheco's testimony and, thus, depended upon winning a credibility contest.

Escape in the second degree is committed if a "person intentionally escapes from a correctional or detention facility or from custody." HRS § 710–1021(1) (1993). "Custody" is a defined term and "means restraint by a public servant pursuant to arrest, detention, or order of a court." HRS § 710–1000 (1993); *see also State v. Nakoa,* 72 Haw. 360, 364–66, 817 P.2d 1060, 1062–64 (1991) (holding that a defendant is "in custody" for purposes of escape statutes once he or she is arrested, has had his or her liberty restrained such that he or she is not free to leave, and, thus, the "first step in the process

of transporting him or her to the police station ha[s] begun"); *State v. Smith,* 59 Haw. 456, 462–64, 583 P.2d 337, 342–43 (1978) ("custody" for purposes of escape statutes is not confined to merely "actual custody" but is satisfied "even though [a defendant] is not in actual physical custody or under immediate control and supervision of a guard"). "Escape," however, is not a statutorily defined term but is generally defined to mean "[t]he act or an instance of breaking free from confinement, restraint, or an obligation," *see Black's Law Dictionary* at 564 (7th ed.1999), or "to get away from," "to break away, get free, or get clear," and "to avoid or elude," *see Webster's New International Dictionary of the English Language* at 871 (2d ed.1960).

Pacheco's own testimony conceded the requisite conduct, attendant circumstances, and result of conduct elements of the offense of second degree escape, insofar as Pacheco implicitly, if not expressly, admitted: (1) that he indeed ran, jumped a wall, and dove into the stream (conduct); (2) that, under the circumstances, which included having been placed under arrest, the attributes of his conduct constituted fleeing, avoiding, and breaking free from the restraint imposed by the presence of the three police officers (attendant circumstances); and (3) that the result of his conduct was that he was no longer under the restraint of, and had successfully broken free from and fled, the three officers (result of conduct). Moreover, Pacheco's own testimony also supports inferences (1) that his conscious object was to run, hop the wall, and swim in the stream (and, hence, that he possessed the requisite state of mind with respect to the conduct element of the offense) and (2) that he was aware, in engaging in the foregoing conduct, that he was breaking free from the restraint imposed by the presence of the three officers, he was fleeing them, and he was avoiding custody (and, hence, that he possessed the requisite state of mind with respect to the attendant circumstances element of the offense). *See* HRS §§ 702–206(1)(a) and (b) (1993).

What Pacheco specifically and expressly disputed in his testimony was that his conscious object, in running from the officers,

jumping the wall, and swimming in the stream, was to avoid arrest and custody, or, in other words, that he possessed the requisite state of mind with respect to the result of conduct element of the offense of escape in the second degree. *See* HRS § 702-206(1)(c) (1993). Rather, Pacheco expressly testified that his sole conscious object in engaging in the foregoing conduct was to avoid, not custody, but being assaulted by Sellers. Indeed, the record is uncontroverted that: (1) at the time the first two officers arrested him, Pacheco made no attempt to flee or avoid being placed in custody; (2) while in the stream, although Pacheco struggled with the HFD officers as they attempted to extract him from the water, Pacheco made no further attempt to exit the stream or otherwise run away; and (3) at no point did Pacheco exhibit any attempt to free himself from the handcuffs. Had the jury believed Pacheco with respect to his state of mind regarding the result of his conduct, it would have had little choice but to acquit him.[10] Absent crediting his testimony, however, the prosecution's evidence could support an inference that Pacheco's conscious object was to escape, *i.e.*, that his flight from the park bench, coupled with his resistence to being reapprehended by the HFD officers attempting to extract him from the stream, sufficed to support the inference that Pacheco's conscious object was to remain free from custody.

Thus, had the jury believed Pacheco's testimony, it may well have harbored a reasonable doubt as to whether Pacheco had possessed the state of mind requisite to committing the offense of second degree escape. As such, and given that the record reflects that the jury was, in fact, initially "at a stalemate with the problem of intent," we cannot say that the evidence against Pacheco was so overwhelming as to render the DPA's personal disparagements of him and vigorous and improper attack on his credibility harmless beyond a reasonable doubt. *Cf., e.g., Rogan,* 91 Hawai'i at 415, 984 P.2d at 1241 (evidence against defendant was not overwhelming where it consisted of little more than contrary testimony of witnesses).

Inasmuch as (1) the nature of the prosecutor's remarks constituted misconduct, (2) the circuit court gave no curative instruction, and (3) the evidence in the case consisted of contrary testimony giving rise to a credibility contest, the prosecution's repeated reference to Pacheco as an "asshole" was not harmless beyond a reasonable doubt. *See, e.g., Rogan,* 91 Hawai'i at 415-16, 984 P.2d at 1241-42. On this basis alone, Pacheco would, at the very least, be entitled to a new trial with respect to the charged offense of second degree escape.[11]

2. *Pacheco as "convicted thief" not worthy of belief*

 On appeal, Pacheco claims, the prosecution concedes, and we emphatically agree, that the DPA's willful violation of the circuit court's *in limine* ruling constituted prosecutorial misconduct.[12] No curative instruction was given at any time during the

---

10. In fact, Pacheco's testimony, if believed, negated any inference that he was even aware that it was practically certain that his conduct would result in his no longer being under the restraint of, and therefore having broken free from and fled, the three officers. In other words, Pacheco's testimony negated even a knowing—much less the requisite intentional—state of mind with respect to the result of conduct element of second degree escape. *Compare* HRS § 702-206(2)(c) (1993) *with* HRS § 702-206(1)(c). This underscores the extent to which, having been deprived of a choice of evils defense, *see infra* section III.D., Pacheco's credibility was all the more critical.

11. Notwithstanding that defense counsel failed to renew his objection to the DPA's vulgar and disparaging characterization of Pacheco during the DPA's closing argument, the DPA's remarks, insofar as they were not harmless beyond a reasonable doubt, affected Pacheco's substantial right to a fair trial and, thus, constituted plain error.

12. "A prosecutor has the responsibility of a minister of justice and not simply that of an advocate. This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence." *State v. Quitog,* 85 Hawai'i 128, 136-37 n. 19, 938 P.2d 559, 567-68 n. 19 (1997) (quoting Comment [1] to Hawai'i Rules of Professional Conduct Rule 3.8); *State v. Baron,* 80 Hawai'i 107, 115, 905 P.2d 613, 621, *reconsideration granted in part and denied in part,* 80 Hawai'i 187, 907 P.2d 773 (1995) (same).

DPA's cross-examination of Pacheco, during which the DPA first asserted that the jury should not believe a "convicted thief," nor during his closing arguments, in which he argued the point at length. And, as noted above, the evidence regarding Pacheco's state of mind ultimately devolved into a contest of credibility. Because we cannot say that the DPA's remarks in this regard were harmless beyond a reasonable doubt, the DPA's willful violation of the circuit court's *in limine* ruling would sustain an alternative basis upon which to grant Pacheco's request for a new trial.

### 3. *Reprosecution is not barred under principles of double jeopardy.* ·

 Pacecho asserts that the DPA's willful disregard of the circuit court's prophylactic ruling precluding it from referring to or arguing that his prior theft conviction constituted a "crime of dishonesty," taken cumulatively with the DPA's repeated characterization of Pacheco's conduct on July 21, 1999 as that of an "asshole," constituted such egregious prosecutorial misconduct that, under *Rogan,* a second trial is barred by the prohibition against double jeopardy. We disagree.

In *Rogan,* we held that "reprosecution of a defendant after a mistrial or reversal on appeal as a result of prosecutorial misconduct is barred where the prosecutorial misconduct is so egregious that, from an objective standpoint, it clearly denied a defendant his or her right to a fair trial." 91 Hawai'i at 423, 984 P.2d at 1249. We limited application of this rule, however, to only the most "exceptional circumstances" of egregious prosecutorial misconduct. *Id.* at 423 n. 11, 984 P.2d at 1249 n. 11. As deplorable as we regard the DPA's flagrant defiance of the circuit court's in limine ruling and personal and vulgar denigration of the defendant, we do not believe that the DPA's misconduct rose to such a level as to be comparable to the misconduct present in *Rogan,* in which the prosecutor infected the defendant's trial with an overt appeal to racial prejudice. Simply said, the circumstances present here are not the sort of "exceptional circumstances" that, under *Rogan,* preclude reprosecution after a defendant's conviction has been vacated on appeal due to prosecutorial misconduct. Accordingly, reprosecution of Pacheco for the offense of escape in the second degree is not barred by principles of double jeopardy.

Because we vacate and remand this matter for a new trial as to the charged offense of second degree escape, and in order to provide guidance to the circuit court and the parties, we address Pacheco's claims that the circuit court erred in admitting evidence of his prior petty theft conviction for purposes of impeachment, *see infra* section III.B., and that his trial counsel rendered ineffective assistance, *see infra* section III.C.; lastly, we observe that if, on remand, evidence is adduced supporting a choice of evils defense, Pacheco would be entitled to a jury instruction pursuant HRS § 703–302(1), rather than HRS § 703–303(3), which we hold *infra* in section III.D. is inapplicable to prosecutions of first and second degree escape predicated on an escape from custody.

### B. *The circuit court erred in allowing the prosecution to introduce Pacheco's prior theft conviction for impeachment purposes.*

#### 1. *A petty theft conviction is not, per se, a "crime of dishonesty," such that it is admissible for impeachment purposes.*

 The circuit court, with respect to Pacheco's *in limine* motion seeking to preclude the prosecution from adducing the fact of his prior theft conviction, expressly ruled that the conviction was· admissible under HRE Rule 609(a) but that, nevertheless, the DPA could not refer to Pacheco's prior theft conviction as a "crime of dishonesty" in the jury's presence. Implicitly, the circuit court ruled that, although the fact of Pacheco's prior conviction was admissible under HRE Rule 609(a), the prosecution could not expressly argue that the fact that Pacheco had been convicted previously of a theft offense undermined his credibility. The DPA's questions of Pacheco, inviting the jury to disbelieve a "thief" because he was attempting to "bamboozle" them "to beat the rap," as well as his improper remarks during his closing and rebuttal arguments, which expressly ad-

vised the jury to disbelieve the testimony of Pacheco, whom he characterized as an "asshole" and a "convicted thief," on the basis of his assertion that theft was a "crime of dishonesty," patently violated the circuit court's *in limine* ruling. The circuit court, however, should not have allowed the prosecution to adduce any evidence *at all* concerning Pacheco's prior theft conviction, pursuant to HRE Rule 609, *see supra* note 7.

HRE Rule 609(a) provides in relevant part that "evidence that the witness has been convicted of a crime is inadmissible" to impeach the witness's credibility "*except when the crime is one involving dishonesty.*" (Emphasis added.) HRE Rule 609 represents an exception to the general rule of the inadmissibility of character evidence set forth in HRE Rule 404(a)(3) (1993), which provides in relevant part that "[e]vidence of a person's character or a trait of his [or her] character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except ... as provided in [HRE Rule] 609[.]"

 The commentary to HRE Rule 609 notes that HRE Rule 609(a) was drafted to "reflect[ ] the wisdom of *Asato*," in which this court held that evidence of a witness's prior conviction admitted for impeachment purposes is "limited to those convictions that are relevant to the issue of truth and veracity." *Asato*, 52 Haw. at 293, 474 P.2d at 295. In *Asato*, this court observed that

[i]n every instance where a witness is sought to be impeached, the only issue that arises is whether the witness is telling the truth. It is character and reputation for truth and veracity, not any other character trait, that is in issue. Therefore, any evidence adduced on this issue, in order to be relevant ·at all, must go to the issue of truth and veracity. We think that there are a great many criminal offenses the conviction of which has no bearing whatsoever upon the witness's propensity for lying or truth-telling, and that such convictions ought not to be admitted for purposes of impeachment.

*Id.* at 292, 474 P.2d at 294 (citations omitted). The types of convictions that this court viewed as exemplifying those that were potentially admissible for impeachment purposes included convictions relating to "the class of crimes involving dishonesty[,] false statement," or perjury. *Id.* at 293, 474 P.2d at 295. This court therefore adopted the rule that "a prior conviction may come in if, but only if, the trial judge, in his [or her] discretion, feels that the party offering the evidence has satisfactorily shown that the conviction to be proved rationally carries probative value on the issue of the truth and veracity of the witness." *Id.* at 294, 474 P.2d at 295. In accord with *Asato*, the commentary to HRE Rule 609 notes that the rule employs "negative phraseology (the evidence 'is inadmissible except when the crime is one involving dishonesty') ... to make it clear that [HRE] Rule 403's discretionary balance governs the question of admissibility under" HRE Rule 609.[13]

 Thus, as an initial matter, if a party proffers evidence of a prior conviction to impeach the credibility of a witness, the trial court must first expressly determine whether the proffering party has "shown that the conviction ... rationally carries probative value on the issue of the truth and veracity of the witness." *Asato*, 52 Haw. at 293, 474 P.2d at 295; *see also Reed v. City and County of Honolulu*, 76 Hawai'i 219, 226, 873 P.2d 98, 105 (1994) (noting that a complaining witness' criminal record is admissible solely on the issue of witness' credibility and, at that, "only if it is determined that the prior convictions involved crimes of dishonesty"). In the context of criminal matters, then, it is incumbent upon the prosecution to establish, and upon the trial court expressly to find, that a defendant's prior conviction, which has been proffered to impeach the defendant's testimony, is of a "crime of dishonesty," such that it is relevant to and probative of the defendant's veracity as a witness.

 The universe of convictions of offenses that "fall into the class of crimes

---

13. HRE Rule 403 (1993) provides in relevant part that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury[.]"

100

involving dishonesty" is quite small. As we noted in *Asato,* minor offenses "like parking tickets or driving with loud mufflers or running red lights," as well as major offenses "like murder or assault and battery" and other crimes of violence, lack "any rational connection" with "the likelihood that the witness will tell the truth" under oath. *Asato,* 52 Haw. at 293, 295, 474 P.2d at 295–96 (holding that "conviction for heedless and careless driving bears no relation to a witness' credibility"); *see also State v. Tafoya,* 91 Hawaiʻi 261, 268 n. 5, 982 P.2d 890, 897 n. 5 (1999) (ruling that evidence of defendant's prior convictions, *inter alia,* of assault and terroristic threatening were not admissible under HRE Rule 609(a)).

■ In the criminal (as distinguished from the civil) context, in which the stakes include a defendant's constitutional right affirmatively to testify in his or her own defense, we have "go[ne] further." *State v. Santiago,* 53 Haw. 254, 260, 492 P.2d 657, 661 (1971). In *Santiago,* this court held that, when a criminal defendant testifies but does not "introduce testimony for the sole purpose of establishing his [or her] credibility," his or her constitutional right to testify is violated if the prosecution impeaches the defendant's credibility via evidence of his or her prior convictions. *Id.* The foregoing holding was premised upon the concern that "a defendant's knowledge that the jury may conclude from the prior convictions that he [or she] is guilty may compel him [or her] to forego his [or her] privilege to testify." *Id.* Thus, in the context of criminal prosecutions, *Santiago* embodies the following reservations concerning the universe of offenses that might be admissible to impeach a defendant's credibility:

... [P]rior convictions are of little real assistance to the jury in its determination of whether the defendant's testimony as a witness is credible. When the prior crime has nothing to do with dishonesty, there may be no logical connection whatsoever between the prior crime and the determination of whether the defendant may be believed.... Furthermore, since the jury is presumably qualified to determine whether or not a witness is lying from his

[or her] demeanor and his [or her] reaction to probing cross-examination, there would appear to be little need for evidence of prior convictions even if the crime involves false statements.

*Santiago,* 53 Haw. at 259, 492 P.2d at 661 (footnotes omitted).

■ In light of the foregoing, a theft offense is not, *per se,* a "crime of dishonesty" such that it is admissible to impeach a criminal defendant's credibility. *See, e.g., State v. Pudiquet,* 82 Hawaiʻi 419, 427, 922 P.2d 1032, 1040 (App.) (trial court properly determined that nine-year-old theft conviction was not a crime of dishonesty and, thus, was too "collateral" and "remote" to be admissible to impeach prosecution's witness), *cert. denied,* 82 Hawaiʻi 360, 922 P.2d 973 (1996); *State v. Emmsley,* 3 Haw.App. 459, 461 & n. 1, 466–68, 652 P.2d 1148, 1150 & n. 1, 1154 (1982) (trial court did not abuse its discretion in ruling that complaining witness's juvenile adjudications as a law violator for committing the offenses of malicious conversion—*i.e.,* theft of an automobile—and larceny were not relevant to witness's veracity). Rather, to be admissible impeachment evidence pursuant to HRE Rule 609(a), the defendant must have committed the prior theft offense under circumstances that, by their very nature, render his or her prior conviction of the offense relevant to and probative of his or her veracity as a witness.

In the present matter, the record is essentially silent with respect to the circumstances under which Pacheco committed the petty theft offense of which he had previously been convicted. At most, the record reflects that the prosecution represented to the circuit court that the prior incident involved "shoplifting" from a "church." Consequently, the prosecution failed to establish that Pacheco's prior theft conviction involved conduct relevant to or probative of Pacheco's veracity as a witness. Absent the requisite showing, Pacheco's prior conviction of a petty theft offense could not be deemed a "crime of dishonesty" and was therefore inadmissible to impeach his credibility as a witness. That being the case, the circuit court erred in ruling that Pacheco's prior theft conviction was admissible under HRE Rule 609(a).

**2.** *Even if Pacheco's prior conviction was admissible for impeachment purposes, the prosecution prematurely elicited testimony concerning it.*

■ Even assuming that the prosecution could have established that Pacheco's prior petty theft conviction was probative of Pacheco's veracity as a witness, defense counsel rendered Pacheco ineffective assistance in failing to object to the prosecution's premature elicitation of testimony regarding Pacheco's prior conviction during its redirect examination of Officer Sellers, *see infra* section III.C., before Pacheco had himself "introduced testimony for the purpose of establishing [his] credibility as a witness," as required by HRE Rule 609(a), *see supra* note 7.

■ In *Santiago*, the defendant testified but did not "himself introduce[ ] testimony for the sole purpose of establishing his credibility as a witness." 53 Haw. at 256, 261, 492 P.2d at 660–61. Under those circumstances, we held, as a matter of due process under both the Hawai'i and United States Constitutions,[14] that evidence of prior convictions could not be used to impeach a defendant, notwithstanding any rule of evidence—such as HRS § 621–22 (1968), which was the predecessor to HRE Rule 609(a)—or any rule of this court to the contrary. *Id.* at 260–61, 492 P.2d at 661. Consequently, as the commentary to HRE Rule 609(a) notes, in order to "implement[ ] the due process mandate of . . . *Santiago*," the rule provides in relevant part that,

> in a criminal case where the defendant takes the stand, the defendant shall not be questioned or evidence introduced as to whether the defendant has been convicted of a crime, for the sole purpose of attacking credibility, *unless the defendant has oneself introduced testimony for the purpose of establishing the defendant's credibility as a witness*, in which case the defendant shall be treated as any other witness.

(Emphasis added.) Thus, HRE Rule 609(a) presupposes that, before evidence of a defendant's prior conviction may be admitted for purposes of impeachment, the defendant must first elicit testimony—either the defendant's own or that of other witnesses—the materiality of which is to seek to establish that he or she is testifying honestly or truthfully or is worthy of belief. *See, e.g., Santiago*, 53 Haw. at 256, 260–61, 492 P.2d at 660–61 (defendant testified, but did not introduce testimony for the sole purpose of establishing his credibility as a witness; accordingly, defendant's prior conviction inadmissible for impeachment purposes).

During the prosecution's case-in-chief and before Pacheco had the opportunity to testify, much less affirmatively to testify that he was worthy of belief (which, we note, the record reflects that he never did), the DPA adduced the fact that Pacheco had been previously convicted of a theft offense during its redirect examination of Officer Sellers. Defense counsel failed to object. In light of our holding in *Santiago* and the plain language of HRE Rule 609(a), which unambiguously precluded the introduction of *any* prior conviction evidence for impeachment purposes unless and until Pacheco had affirmatively elicited testimony seeking to establish that he was worthy of belief, Pacheco's defense counsel should have objected in order to preclude the prosecution from prematurely adducing evidence of Pacheco's prior theft conviction. As a result of his failure to do so, he rendered Pacheco ineffective assistance, *see infra* section III.C.

**C.** *Pacheco's trial counsel rendered ineffective assistance in failing to object (1) to the elicitation of testimony concerning his prior conviction by the prosecution during its redirect examination of Officer Sellers and (2) to the DPA's remarks, which directly violated the circuit court's ruling in limine, during the DPA's closing and rebuttal arguments.*

■ With respect to Pacheco's ineffective assistance of counsel claim predicated on de-

**14.** Article I, section 5 of the Hawai'i Constitution (1978) provides in relevant part that "[n]o person shall be deprived of life, liberty or property without due process of law." Similarly, the four-teenth amendment to the United States Constitution provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law."

fense counsel's failure to object to the premature introduction by the prosecution of Pacheco's prior conviction, we note that, in light of our discussion *supra* in section III.B.2., had counsel done so, the objection surely would have been sustained, and, unless Pacheco himself introduced evidence for the sole purpose of establishing his credibility as a witness, the evidence of his prior conviction would never have been admitted. With regard to Pacheco's claim that his trial counsel was ineffective for failing to object to the DPA's improper closing and rebuttal arguments in connection with Pacheco's prior petty theft conviction, we note that, in light of our discussion *supra* in section III.A., the remarks should have formed the grounds for sustained objections and appropriate curative instructions.

Defense counsel's omissions in this regard did not and could not have been calculated to benefit Pacheco's case, given, as we have observed, that a principal issue before the jury was Pacheco's credibility. *See, e.g., Dan,* 76 Hawai'i at 427, 879 P.2d at 533 ("omissions [that have] an obvious tactical basis for benefitting the defendant's case will not be subject to further scrutiny" (quoting *Briones,* 74 Haw. at 462–63, 848 P.2d at 976)). Defense counsel's omissions deprived Pacheco of a potentially meritorious defense insofar as it is likely that, had trial counsel provided him assistance within the range of competence demanded of attorneys in criminal cases, the evidence of his prior conviction, and, *a fortiori,* the DPA's improper questions and remarks regarding it, would not have been introduced. Not only did defense counsel fail timely to object to the premature introduction of evidence concerning Pacheco's prior conviction, but he also failed to cite to the trial court, either orally or in a memorandum of law, any authority—the existence of which our discussion *supra* in section III.B. amply reflects—supporting his position that the conviction was inadmissible for purposes of impeaching Pacheco and, in any event, was not admissible until Pacheco himself introduced testimony tending to establish his credibility as a witness.

Thus, we believe that the record on appeal conclusively establishes that there were no legitimate "tactical" bases upon which defense counsel's omissions could conceivably have been predicated. We therefore hold that Pacheco's trial counsel rendered him ineffective assistance. *See Aplaca,* 74 Haw. at 66–73, 837 P.2d at 1305–08 (holding, as a matter of law, that defendant was denied effective assistance of counsel where record on appeal conclusively reflected that trial counsel's assistance fell below the level of ordinary competence demanded of lawyers in criminal cases, reflected lack of skill, judgment, or diligence, and substantially impaired a meritorious defense); *cf. Briones,* 74 Haw. at 464, 848 P.2d at 977 (noting that "[i]f the record is unclear or void as to the basis for counsel's actions, counsel shall be given the opportunity to explain his or her actions in an appropriate proceeding"). Had defense counsel's assistance been within the level of ordinary competence demanded of criminal lawyers, the jury would have assessed Pacheco's credibility free of the improper considerations, outside the bounds of admissible evidence, with which it was presented. *Cf. Jones v. State,* 79 Hawai'i 330, 902 P.2d 965 (1995) (noting that "the provision of erroneous legal advice to a defendant by trial counsel—*e.g.,* misinforming the defendant as to the types of evidence that can be used to attack his or her credibility on cross-examination . . .—could constitute a 'lack of skill'" rising to the level of ineffective assistance of counsel (citing *People v. Mosqueda,* 5 Cal. App.3d 540, 85 Cal.Rptr. 346, 349 (1970) (considering defendant's claim that "he did not testify at his trial because the public defender erroneously advised him that if he testified the [prosecution] could impeach him by disclosing his past criminal record to the jury"))).

 In light of the foregoing, we hold that defense counsel's ineffective assistance provides an alternative basis for vacating Pacheco's conviction of escape in the second degree and remanding this matter for a new trial.[15]

---

15. Pacheco also asserts that his trial counsel was ineffective in failing to investigate and subpoena

potential witnesses. Generally, "[i]f counsel does not adequately investigate the underlying

D. *The generic choice of evils defense, set forth in HRS §§ 703-302(1), rather than the limited choice of evils defense, set forth in HRS § 703-302(3), is applicable to prosecutions for first and second degree escape predicated on an escape from non-incarcerational custody.*

As a final matter, we address the latent ambiguity present in HRS § 703-302 regarding whether a defendant charged with first or second degree escape may assert a choice of evils defense where the specific limited affirmative defense set forth in HRS § 703-302(3) defies application to the facts adduced at trial. In this regard, we note generally that a defendant is "entitled to an instruction on every defense supported by the evidence, no matter how inconclusive the evidence may be, provided that evidence would support consideration of that issue by the jury." *State v. McMillen,* 83 Hawai'i 264, 265, 925 P.2d 1088, 1089 (1996); *see also State v. Ortiz,* 93 Hawai'i 399, 404, 4 P.3d 533, 538 (App.2000). HRS §§ 703-302(1) and (3) [16] provide in relevant part:

> (1) Conduct which the actor believes to be necessary to avoid an imminent harm or evil to the actor or to another is justifiable provided that:

facts of a case, including the availability of prospective defense witnesses, counsel's performance cannot fall within the 'wide range of reasonable professional assistance.'" *State v. Aplaca,* 74 Haw. at 71, 837 P.2d at 1307 (1992) (quoting *State v. Templin,* 805 P.2d 182, 188 (Utah 1990)). The reason for such a *per se* rule is that "a decision not to investigate cannot be considered a tactical decision [because] it is only after an adequate inquiry has been made that counsel can make a reasonable decision to call or not to call particular witnesses for tactical reasons." *Aplaca,* 74 Haw. at 71, 837 P.2d at 1307 (quoting *Templin,* 805 P.2d at 188). In the present matter, the record reflects that Pacheco had provided the names of several potential witness to defense counsel and that defense counsel had not, as of the date trial was scheduled to commence, investigated any of these potential witnesses. Rather, defense counsel had informed Pacheco that he would need to request a continuance of the trial date in order to investigate the witnesses. Pacheco informed defense counsel that he did not want to postpone the trial, a position that the circuit court, during a colloquy with Pacheco, confirmed.

> (a) The harm or evil sought to be avoided by such conduct is greater than that sought to be prevented by the law defining the offense charged; and
>
> (b) Neither the Code nor other law defining the offense provides exceptions or defenses dealing with the specific situation involved; and
>
> (c) A legislative purpose to exclude the justification claimed does not otherwise plainly appear.
>
> . . . .
>
> (3) In a prosecution for escape under [HRS §§ ] 710-1020 or 710-1021, the defense available under this section is limited to an affirmative defense consisting of the following elements:
>
> (a) The actor receives a threat, express or implied, of death, substantial bodily injury, or forcible sexual attack;
>
> (b) Complaint to the proper *prison authorities* is either impossible under the circumstances or there exists *a history of futile complaints;*
>
> (c) Under the circumstances there is no time or opportunity to resort to the courts;
>
> (d) No force or violence is used against *prison personnel or other innocent persons;* and

Even if we were to hold that Pacheco did not waive this basis for his ineffective assistance of counsel claim, despite his refusal of the circuit court's offer to continue trial in order for defense counsel to investigate the potential witnesses, the record does not reflect how these witnesses would have assisted Pacheco's defense. The record is devoid of any indication, by way of affidavit, deposition, or any other assertion via an offer of proof or otherwise, with respect to what these witnesses would have testified. Absent such an indication, the record is not developed enough for us to determine whether the absence of testimony from these potential witnesses deprived Pacheco of a potentially meritorious defense.

16. The state of mind requisite to first and second degree escape is "intent," *see* HRS §§ 710-1020 and 710-1021; thus, HRS § 703-302(2) (1993) is not relevant to our discussion and analysis of the choice of evils defense as it pertains in prosecutions of the offense of escape, inasmuch as it provides that, in certain circumstances, the choice of evils defense is not available in a prosecution "for any offense for which recklessness or negligence, as the case may be, suffices to establish culpability."

(e) The actor promptly *reports to the proper authorities when the actor has attained a position of safety* from the immediate threat.

(Emphases added.) As discussed *supra* in section I., defense counsel initially requested that the jury be instructed on the generic choice of evils defense set forth in HRS § 703–302(1). However, after an off-the-record bench conference, and recognizing that, while it appeared that HRS § 703–302(3) applied in lieu of HRS § 703–302(1), the limited choice of evils defense available to "prosecutions for escape" defied easy application to the facts of the present matter, defense counsel withdrew his proposed instruction. Consequently, no choice of evils instruction was given to the jury, and defense counsel had no choice but to focus his closing argument on Pacheco's state of mind and the defense of duress.[17] We take this opportunity to clarify that the generic choice of evils defense set forth in HRS § 703–302(1), rather than the limited defense set forth in HRS § 703–302(3), is applicable to first and second degree escape prosecutions that are predicated on escapes from non-incarcerational custody.

The fact that HRS §§ 703–302(3)(b) ("complaint to the proper *prison* authorities") and (3)(d) ("against *prison* authorities or other innocent persons") expressly refer to prison authorities, although subsection (3) purports to apply to all "prosecutions for escape," including not only escape from a correctional or detention facility but also from custody,[18] injects a latent ambiguity into subsection (3) such that it is not readily apparent whether the legislature intended that the specific choice of evils defense it sets forth apply to a prosecution for escape from custody.

While scant, the legislative history underlying HRS § 703–302 reflects that subsection (3) was not intended to apply in an escape

prosecution predicated upon an escape from non-incarcerational custody and, moreover, was not intended to divest a defendant so charged with the otherwise applicable generic choice of evils defense set forth in HRS § 703–302(1). HRS §§ 703–302(1) and (2) were drawn from Model Penal Code (MPC) § 3.02 and initially codified in 1972; the MPC, however, does not contain a section comparable to HRS § 703–302(3), which was codified in 1986 as part of an omnibus act reflecting substantial revisions to and reformation of the HPC. Rather, HRS § 703–302(3) was intended to codify the holding of *State v. Horn*, 58 Haw. 252, 566 P.2d 1378 (1977). *See Progress Report of the Judicial Council Committee on Penal Code Revision and Reform*, January 16, 1984, at 8–9 and Appendix E; *see also State v. Ortiz*, 93 Hawaiʻi 399, 409–10, 4 P.3d 533, 543–44 (App. 2000).

In *Horn*, the defendant escaped from prison. 58 Haw. at 254, 566 P.2d at 1380. This court was presented with the question whether the defense of "necessity" was available to a defendant in an escape prosecution. *Id.* at 253, 566 P.2d at 1379. Adopting, with one modification, the rationale and holding of *People v. Lovercamp*, 43 Cal.App.3d 823, 118 Cal.Rptr. 110 (1974), which also arose in the context of an escape from prison, this court held that a "limited defense of necessity" is available to a defendant charged with escape. The *Lovercamp* court held that the defense is available if:

(1) The prisoner is faced with a specific threat of death, forcible sexual attack[,] or substantial bodily injury in the immediate future;

(2) There is no time for a complaint to the authorities or there exists a history of futile complaints which make any result from such complaints illusory;

---

17. We note that, as the Intermediate Court of Appeals recently held in *State v. Ortiz*, 93 Hawaiʻi 399, 4 P.3d 533 (2000), a defendant may be entitled to both choice of evils and duress instructions, even if the two defenses are inconsistent with each other, so long as evidentiary support for both defenses is adduced at trial. *Id.* at 404–405, 4 P.3d at 538–39 (citing *State v. Horn*, 58 Haw. 252, 255, 566 P.2d 1378, 1380 (1977)). However, insofar as a duress defense is available only if, *inter alia*, "the defendant engaged in the

conduct or caused the result alleged because he was *coerced* to do so," HRS § 702–231(1) (empahsis added), it appears that a duress defense was not available to Pacheco because there is no evidence in the record that Officer Sellers coerced Pacheco to escape.

18. HRS §§ 710–1020 (1993) and 710–1021 have not been amended since enacted originally in 1972.

(3) There is no time or opportunity to resort to the courts;

(4) There is no evidence of force or violence used towards prison personnel or other "innocent" persons in the escape; and

(5) The prisoner immediately reports to the proper authorities when he has attained a position of safety from the immediate threat.

*Horn*, 58 Haw. at 253–54, 566 P.2d at 1379–80 (quoting *Lovercamp*, 43 Cal.App.3d at 831–32, 118 Cal.Rptr. at 115). The modification imposed by this court in *Horn* was that the threat need not be a "specific threat." *Horn*, 58 Haw. at 254, 566 P.2d at 1380. Rather, we held that "[i]t is enough that specific and articulable conditions *within the prison* exist which seriously expose the prisoner to severe injury." *Id.* (emphasis added). The *Horn* court also cited *People v. Harmon*, 394 Mich. 625, 232 N.W.2d 187 (1975), which similarly arose in the context of an escape from prison. *Horn*, 58 Haw. at 255–56, 566 P.2d at 1381.

In light of the foregoing, it is apparent that the limited choice of evils defense set forth in HRS § 703–302(3) was crafted to address escapes from incarceration in a correctional or other detention facility. However, there is no indication in the commentary to HRS § 703–302, the legislative record, or the case law that HRS § 703–302(3) was intended to codify that evinces that the legislature intended to deprive a defendant charged with escape from custody of a choice of evils defense. In light of the case law that HRS § 703–302(3) was intended to codify and the absence of any legislative history to the contrary, we hold that the exclusivity of the narrow choice of evils defense set forth in HRS § 703–302(3) is limited to prosecutions for escape from correctional or detention facilities but not to prosecutions for escape from custody that does not implicate an incarcerational setting. Because the generic choice of evils defense set forth in HRS §§ 703–302(1), if supported by the evidence adduced at trial, is indeed better suited than HRS § 703–302(3) to situations in which a defendant has escaped from non-incarcerational custody, we further hold that the generic choice of evils defense is applicable in a prosecution for escape from custody.

That being the case, if, on remand, the evidence adduced at trial supports the generic choice of evils defense, Pacheco is entitled to have the jury instructed on that defense.

## IV. CONCLUSION

For the foregoing reasons, we vacate Pacheco's conviction of the charged offense of escape in the second degree and remand this matter for a new trial as to that charge. We affirm Pacheco's conviction of and sentence for the offense of drinking in a public park.