**Electronically Filed
Supreme Court
SCOT-19-0000044
09-JUN-2020
08:43 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---oOo---

_____

IN THE MATTER OF THE APPLICATION OF THE GAS COMPANY, LLC
dba HAWAII GAS FOR APPROVAL OF RATE INCREASES AND
REVISED RATE SCHEDULES AND RULES

_____

APPEAL FROM THE PUBLIC UTILITIES COMMISSION
(Agency Appeal)

SCOT-19-0000044

JUNE 9, 2020

RECKTENWALD, C.J., NAKAYAMA, McKENNA, AND POLLACK, JJ.[1]

OPINION OF THE COURT BY McKENNA, J.

## I.  Introduction

In this appeal, Life of the Land and Hui Aloha 'Āina o Ka

Lei Maile Ali'i ("LOL" and "KLM," respectively, or sometimes

---

[1]    Pursuant to Hawai'i Revised Statutes ("HRS") § 602-10 (2016), titled "Full court; oral argument; substitute justices," the parties before this court "shall be entitled to consideration by a full court."  Further, under that statute, "Oral argument shall be before a full court. . . ."  "After oral argument of a case," however, "if a vacancy arises or if for any other reason a justice is unable to continue on the case, the case may be decided or disposed of upon the concurrence of any three members of the court without filling the vacancy or the place of such justice."  The full court (consisting of Chief Justice Recktenwald and Justices Nakayama, McKenna, Pollack, and Wilson) heard oral argument on this case on January 23, 2020.  After oral argument, Justice Wilson recused himself.  Therefore, this case is hereby decided by Chief Justice Recktenwald and Justices Nakayama, McKenna, and Pollack.

collectively "Appellants") challenge whether the Public Utilities Commission ("PUC") fulfilled its statutory and constitutional obligations in reviewing an application for a rate increase submitted by Hawai'i Gas ("HG"). HG sought to pass on to its customers the costs of its two recently established liquid natural gas ("LNG") projects. HG began importing LNG from the mainland to lessen its reliance on synthetic natural gas ("SNG") manufactured in Hawai'i. LNG displaces a portion of SNG in HG's operations.

Concerned about LNG's effects on climate change, as well as climate change's impact upon native Hawaiians, LOL and KLM moved to intervene in HG's rate case. The PUC denied them intervenor status but allowed them to participate in the proceedings on a limited basis. Specifically, LOL and KLM were allowed to address only "whether the [PUC] should disallow as unreasonable [HG's] LNG costs due to the effects of [HG's] use of imported LNG on the State's reliance on fossil fuels[2] and greenhouse gas emissions" ("GHG emissions")[3]. The PUC expressly considered the

---

[2]     Under HRS § 243-3.5 (2017), "fossil fuel" is defined as "a hydrocarbon deposit, such as coal, natural gas, or liquefied natural gas, derived from the accumulated remains of ancient plants or animals and used for fuel; provided that the term specifically does not include petroleum product."

[3]     The regulations implementing HRS Chapter 342B (2010) (titled "Air Pollution Control"), contain the following definition of "Greenhouse gases": "the air pollutant defined as the aggregate group of six greenhouse gases: carbon dioxide, nitrous oxide, methane, hydrofluorocarbons, perflu[o]rocarbons, and sulfur hexafluoride." Hawai'i Administrative Rules ("HAR") § 11-60.1-1 (2014).

following issue to be "outside the scope of this rate proceeding":  "The participants' asserted interest in a clean and healthful environment beyond the State's borders, given the Hawaii Constitution's limited application and scope to a clean and healthful environment within the State's borders."

Ultimately, the PUC approved HG's rate increase in Decision and Order No. 35969.  It adopted HG's representation that the two LNG projects would decrease GHG emissions in-state.  LOL and KLM appeal, raising statutory and constitutional challenges to the PUC's Decision and Order.  HG continues to challenge whether LOL and KLM have standing to bring this appeal.[4]

In summary, the issues raised in this appeal, and this court's resolution of each issue, as appropriate, are as follows:

> A.    Which standing test applies in this appeal, and whether the Appellants have standing under the applicable test.
>
> Resolution: The two-part test for standing applies, in which the Appellants must show that they are "persons aggrieved" who "participated" in the contested case.  Appellants meet this test, because they demonstrated their members' right to a clean and healthful environment was specially, personally and adversely affected by the PUC's Decision and Order, and they were participants in HG's contested case.

---

[4]    HG had raised standing in an earlier motion to dismiss.  This court denied the motion to dismiss without prejudice to re-visiting the issue upon consideration of the merits of the appeal.

B.    Whether the PUC fulfilled its obligations under HRS § 269-6(b) (2007 & Supp. 2011), which provides the following:

> The public utilities commission shall consider the need to reduce the State's reliance on fossil fuels through energy efficiency and increased renewable energy generation in exercising its authority and duties under this chapter.  In making determinations of the reasonableness of the costs of utility system capital improvements and operations, the commission shall explicitly consider, quantitatively or qualitatively, the effect of the State's reliance on fossil fuels on price volatility, export of funds for fuel imports, fuel supply reliability risk, and greenhouse gas emissions.  The commission may determine that short-term costs or direct costs that are higher than alternatives relying more heavily on fossil fuels are reasonable, considering the impacts resulting from the use of fossil fuels.

> Resolution: The PUC did not fulfill its obligations under HRS § 269-6(b) because its Decision and Order simply reiterated HG's representations that its LNG projects would decrease GHG emissions.  Further, the PUC's geographic limitation demonstrated that the PUC did not intend to consider GHG emissions from production, development, and transportation of LNG occurring outside of the state.  Without that information, however, the PUC could not have explicitly considered the hidden and long-term costs of the state's reliance on fossil fuels.

C.  Whether the PUC violated the Appellants' due process rights by not affording the Appellants a meaningful opportunity to be heard concerning GHG emissions.

> Resolution: The PUC violated the Appellants' due process rights because the substantive limitations on their participation in this rate case rendered meaningless any opportunity to be heard on the GHG emissions issue.

D.  Whether the PUC abused its discretion in developing a policy on measuring GHG emissions through adjudication rather than rule-making.

> Resolution: The PUC did not abuse its discretion in proceeding through adjudication

4

in this case.  The PUC did not attempt to
bypass a rule, amended rule, or pending rule
concerning how it should measure GHG emissions.
Further, Appellants were not unduly burdened in
this rate case proceeding.

E.    Whether the PUC fulfilled its affirmative
constitutional obligation to protect native Hawaiian
traditional and customary practices.

Because the PUC improperly curtailed
Appellants' substantive participation, the
record is not sufficiently developed for us to
address this issue.  On remand, the PUC should
consider its constitutional obligations.

F.    Whether the PUC fulfilled its affirmative
constitutional obligation as trustee over natural resources
within the State's public trust.

Again, because the PUC improperly curtailed
Appellants' substantive participation, the
record is not sufficiently developed for us to
address this issue.  On remand, the PUC should
consider its constitutional obligations.

## II.  Background

### A.  HG's rate case application

In August 2017, HG filed an application with the PUC for

approval to increase its existing gas utility rates and to

revise certain rate schedules and rate rules.  This "rate case"

was brought pursuant to HRS § 269-16 (2007 & Supp. 2014), titled

"Regulation of utility rates; ratemaking procedures."  Under

that statute, "All rates, fares, charges, classifications,

schedules, rules, and practices made, charged, or observed by

any public utility . . . shall be just and reasonable and shall

be filed with the [PUC]."  HRS § 269-16(a) (2007 & Supp. 2014).

HG explained that it needed a total revenue increase of $14.962

million, "or 14.58% increase over revenue at present rates, in

5

order for HG to have the opportunity to recover its reasonably incurred expenses and earn its requested rate of return of 7.51% on its prudently incurred investments in utility property" since its last rate case in 2009.

Relevant to this appeal, HG sought to include the costs of two new LNG projects in its rate base:  the SNG Backup Enhancement Project and the 30% SNG Conversion Project.  HG explained that there is "no indigenous natural gas in Hawaii or access to natural gas distribution pipelines, which means that gas must either be synthetically manufactured or imported."  HG stated that it manufactures its own SNG through a catalytic conversion process "utilizing a by-product of the oil refining process known as naphtha (i.e., SNG Feedstock)."  HG depends upon Par Hawaii Refining, LLC to supply it with SNG Feedstock. HG explained that this imported oil product subjects gas rates to "meaningful price volatility."  Therefore, HG had secured PUC approval to import LNG as a way to "diversify its fuel supply to reduce its dependence on oil-based feedstock and local refinery infrastructure."

The first of the two new LNG projects was the SNG Backup Enhancement Project.  It involved the purchase of close to one million dollars in equipment, including three LNG ISO containers, a trailer chassis, a trailer-mounted mobile re-gasifier, and certain improvements to Pier 38, the location of

the backup system. In 2014, the PUC issued an order that, inter alia, did not preclude HG from including these costs in its next rate case (PUC Docket No. 2013-0184).

The second of the two new LNG projects was the 30% SNG Conversion Project, which uses imported LNG to displace 30% of HG's SNG production. The PUC previously approved the project in 2016 (PUC Docket No. 2014-0315). HG estimated the project cost to be $13.9 million for ISO containers, LNG regasification and injection equipment, relocation of a plant maintenance building, and the ISO container site.

**B. PUC Order No. 35112 setting the rate case issues**

On December 18, 2017, via Order No. 35112, the PUC identified the issues raised by HG in its Application. All of the issues pertained to the economic reasonableness of the rate increase. The only other party to this proceeding was the Consumer Advocate, an ex officio party pursuant to HRS § 269-51 (2007 & Supp. 2014) ("The executive director of the division of consumer advocacy shall be the consumer advocate in hearings before the public utilities commission. The consumer advocate shall represent, protect, and advance the interests of all consumers . . . of utility services. . . . The consumer advocate shall have full rights to participate as a party in interest in all proceedings before the public utilities commissions."). See

also HAR § 6-61-62(a) (1992) ("The consumer advocate is, ex officio, a party to any proceeding before the commission.").

## C.    This court's MECO opinion

Four days before the PUC set its procedural schedule in Order No. 35112, this court issued its opinion in In re Application of Maui Elec. Co., 141 Hawai'i 249, 408 P.3d 1 (2017) ("MECO").  In MECO, we held that there is a "protectable property interest" in the "right to a clean and healthful environment guaranteed by article XI, section 9 and defined by HRS Chapter 269," which governs the PUC.  141 Hawai'i at 253, 271, 408 P.3d at 5, 23.  We also examined the legislative history of HRS § 269-6(b), as amended in 2011, which revealed the legislature's intent "to require the [PUC] to consider the hidden and long-term costs of reliance on fossil fuels, which subjects the State and its residents to 'increased air pollution' and 'potentially harmful climate change due to the release of harmful greenhouse gases.'"  141 Hawai'i at 263, 408 P.3d at 15.  We further held that "HRS § 269-6(b)'s requirement to reduce reliance on fossil fuels and to consider greenhouse gas emissions applies to the fulfillment of all of the Commission's duties."  Id.

**D.    Motions to intervene**

Weeks after the <u>MECO</u> opinion was filed, in January 2018, LOL and KLM[5] each moved to intervene in this rate case.  LOL asserted it had an interest in the environment and in climate change.  KLM stated that it represented native Hawaiian interests.

HG opposed both LOL's and KLM's motions to intervene.  In both filings, HG challenged whether LOL and KLM had standing, arguing that neither met the traditional three-prong test for standing ((1) injury in fact; (2) causation; and (3) redressability)).  Further, HG argued that the PUC had already approved the "current importation of LNG, as a displacement to [HG's] existing oil-based naphtha fuel source," in previous dockets, Docket No. 2013-0184, the SNG Backup Enhancement Project, and Docket No. 2014-0315, the 30% SNG Conversion Project.  HG noted LOL was granted participant status in the 30% SNG Conversion Project and "had an opportunity to meaningfully advocate its position" then.  HG also argued that, if KLM wanted to oppose the HG's importation of LNG, it should have done likewise.  HG concluded its oppositions stating it was not

---

5    Another non-profit group, 350 Hawai'i, also moved to intervene.  350 Hawai'i is not a party to the instant appeal.

opposed to having the PUC grant LOL and KLM participant status in the proceedings.

**E.    PUC Order No. 35267 denying LOL's and KLM's motions to intervene but granting LOL and KLM participant status limited to sub-Issue No. 1h**

In February 2018, the PUC denied the Appellants' motions to intervene; on its own motion, however, the PUC granted the Appellants participant status in this rate case.  In its Order No. 35267, the PUC limited their participation to addressing only the following issue, which the PUC added to the rate case proceeding as "sub-Issue No. 1h":

> 1.  Whether HG's proposed rate increase is reasonable, including, but not limited to:
> . . . .
>> h.  With respect to [HG's] purchase and use of imported [LNG] as part of its gas utility operations, HRS § 269-6(b)'s  requirement that:
>>
>>> In making determinations of the reasonableness of the costs of utility system capital improvements and operations, the commission shall explicitly consider, quantitatively or qualitatively, the effect of the State's reliance on fossil fuels . . . and greenhouse gas emissions.  The commission may determine that short-term costs or direct costs that are higher than alternatives relying more heavily on fossil fuels are reasonable, considering the impacts resulting from the use of fossil fuels.
>>
>> In effect, whether the commission should disallow as unreasonable [HG's] LNG costs due to the effects of [HG's] use of imported LNG on the State's reliance on fossil fuels and greenhouse gas emissions.

The PUC restricted LOL and KLM's input on the GHG emissions issue as follows:

10

Concomitantly, issues outside the scope of this rate proceeding (Docket No. 2017-0105) include, but are not necessarily limited to:

The participants' asserted interest in a clean and healthful environment beyond the State's borders, given the Hawaii Constitution's limited application and scope to a clean and healthful environment within the State's borders.

Evidence of a causal connection between greenhouse gas emissions and climate change.

Instead, this commission, pursuant to HRS § 91-10(4) (taking notice of judicially recognizable facts) and HAR § 6-61-48 (official notice of matters as may be judicially noticed by the courts of the State), takes official notice of:

A. Act 32, part I, Session Laws of Hawaii 2017, by which the Legislature: (i) recognizes that "[c]ountless scientific studies have concluded that greenhouse gas emissions are a leading contributing factor to global warming[;]" and (ii) finds that climate change is "real."

B. HRS chapter 342B, part VI, Greenhouse Gas Emissions, including HRS § 342B-71, which states:

**Statewide greenhouse emissions limit, adoption.** A statewide greenhouse gas emissions limit to be achieved by 2020 is hereby established that is equal to or below the level of the statewide greenhouse gas emissions in 1990, as determined by section 3 of Act 234, Session Laws of Hawaii 2007; provided that for the purposes of this Act greenhouse gas emissions from airplanes shall not be included.
HRS § 342B-71.

Whether [HG's] importation, purchase, and use of LNG should be banned or prohibited by federal or State law or by the commission.

Whether fracking should be banned or prohibited by federal or State law or by the commission.

Whether all new coal, oil, and gas projects, including "climate intense" projects, should be banned by federal or State law or by the commission.

The PUC rejected HG's argument that LOL should be barred

"from asserting a HRS § 269-6(b) review under the specific

circumstances of the subject proceeding" simply because LOL did not participate in the SNG Backup Enhancement Project docket before the PUC, and participated on a limited basis in the 30% SNG Conversion Project docket before the PUC.  Likewise, the PUC stated that KLM was not similarly barred from asserting an HRS § 269-6(b) review in this case simply because KLM did not move to intervene or otherwise participate in the two prior LNG dockets.  The PUC explained that it read MECO's standing requirement as "appl[ying] to whether an entity has the requisite standing to appeal," not whether an entity has "met its burden of proving that it is entitled to intervene or participate in a [PUC] proceeding, pursuant to the applicable provisions of HAR §§ 6-61-55 and 6-61-56."

**F.   LOL's notice and the PUC Order No. 35346 addressing that notice**

On March 5, 2018, LOL filed a "Notice" with the PUC, challenging Order No. 35627's "exclusion of the entire section of Act 234 [of the 2007 Legislative Session] regarding the global nature of emissions."  Act 234 established a "Greenhouse gas emissions reduction task force" and directed it to create a "work plan" that "shall include but is not limited to the following objectives: . . . . Recommendations to minimize 'leakage' or a reduction in emissions of greenhouse gases within the State that is offset by an increase in emissions of

12

greenhouse gases outside the State. . . ."  Act 234, 2007 Haw. Sess. Laws, at 700.  LOL stated that the PUC should have also taken judicial notice of the global nature of emissions instead of limiting sub-Issue No. 1h to the Participants' interest in "a clean and healthful environment within the State's borders," and not "beyond the State's borders."

In Order No. 35346, dated March 16, 2018, the PUC addressed LOL's Notice.  It reaffirmed its limitation in sub-Issue No. 1h to a clean and healthful environment within, not beyond, the State's borders by citing to article XV, section 1 of the Hawai'i State Constitution, which is titled "Boundaries" and provides the following:

> The State of Hawaii shall consist of all the islands, together with their appurtenant reefs and territorial and archipelagic waters, included in the Territory of Hawaii on the date of enactment of the Admission Act, except the atoll known as Palmyra Island, together with its appurtenant reefs and territorial waters; but this State shall not be deemed to include the Midway Islands, Johnston Island, Sand Island (offshore from Johnston Island) or Kingman Reef, together with their appurtenant reefs and territorial waters.

The PUC also cited to section 2 of the Admission Act, which similarly provides as follows:

> The State of Hawaii shall consist of all the islands, together with their appurtenant reefs and territorial waters, included in the Territory of Hawaii on the date of enactment of this Act, except the atoll known as Palmyra Island, together with its appurtenant reefs and territorial waters, but said State shall not be deemed to include the Midway Islands, Johnston Island, Sand Island (offshore from Johnston Island), or Kingman Reef, together with their appurtenant reefs and territorial waters.

**G.  Joint information requests and HG's responses**

In February 2018, LOL and KLM[6] filed joint information requests to HG seeking answers to 85 questions, the vast majority of which HG refused to answer.  Of importance to this appeal, LOL and KLM asked HG the following question, labeled JP-IR-49 ("information request 49"):  "What [are] the cumulative lifetime greenhouse gas emissions associated with each project seeking rate recovery in this instant docket[?]"  HG first objected to the question as being "vague, ambiguous, irrelevant and outside the scope of sub-Issue No. 1h."  HG ultimately answered the question, however, and represented that the LNG projects would result in decreased GHG emissions as follows:

> Without waiving any right or objection thereto, HG states as follows with respect to the LNG-related projects:
>
> Currently for the 30% [SNG] Conversion Project, which displaces quantities of SNG with LNG, greenhouse gas emissions associated with the SNG Plant's stationary equipment fuel use (reported to the EPA under Subpart C) would decrease due to the amount of SNG displaced with LNG. In other words, greenhouse gas emissions associated with SNG production would decrease because less SNG is produced. Greenhouse gas emissions associated with LNG sold to HG customers (reported to the EPA under Subpart NN) would be nearly identical to displaced SNG because LNG is chemically similar to the SNG produced at the SNG Plant.  The life of the 30% [SNG] Conversion Project has not been determined.
>
> Currently for the [SNG] Backup Enhancement Project, a similar displacement principle would be applicable. However, because the amount of vaporized LNG injected into the transmissions pipeline will vary according to the number and length of SNG Plant shutdowns, the actual amount is difficult to quantify.  For every therm of vaporized LNG

---

[6]     Another organization, Hawai'i 350, was also included in the joint filing, but it is not a party to the present appeal.  See supra, note 5.

injected into the pipeline to back up the SNG Plant, the total amount of greenhouse gas emissions would <u>decrease</u> due to the reduction in stationary equipment fuel necessary to create the displaced SNG.  The life of the [SNG] Backup Enhancement Project has not been determined.

## H.  Joint participants' testimony and exhibits

In March 2018, LOL and KLM jointly[7] filed testimony and exhibits.  KLM highlighted the following impacts of climate change on native Hawaiian cultural practices:

> (1) storms and rising sea levels will destroy navigation points for Hawaiian seafarers;
>
> (2) "forced migration of Polynesian communities [will] exacerbat[e] culture, identity, social welfare, and self-determination efforts";
>
> (3) "rising temperature and ocean acidification [will] alter[] marine species distribution, impacting lawai'a, and their cultural knowledge and practices";
>
> (4) "Papahānaumokuākea Marine National Monument will lose nesting [and pupping] sites for Hawaiian Monk Seal[s], Green Turtle nesting areas and Laysan Finch habitat";
>
> (5) "coastal erosion and rapid sea level rise . . . [will] threaten[] the cultural practice of burying 'iwi kupuna along Hawai'i's shores, which prevents the 'uhane from joining the 'aumakua, interrupting the delicate balance between salt and fresh water in loko i'a, flooding and loss of burial grounds, home sites, fishponds, historic trails, heiau, and petroglyphs, the loss of salt cultivation, beach erosion, and contamination of crops and freshwater resources";
>
> (6) "declining health of the forests, [including] 'ōhi'a lehua losses from Rapid 'Ōhi'a Death, 'āhinahina species on Mauna Loa, Mauna Kea and Haleakalā under threat, avian malaria infected mosquito populations moving up mountains ruining [the] few remaining disease-free refuges for native birds"; and
>
> (7) "mountains are under attack[,] resulting in the loss of the snow season on Mauna Kea, the loss of the home of Poli'ahu."

---

[7]     Another organization, Hawai'i 350, was also included in the joint filing, but it is not a party to the present appeal.  See <u>supra</u>, notes 5&6.

KLM characterized climate change's effect upon native Hawaiians as "another overthrow."

LOL's written testimony focused on two kinds of accounting methodologies by which GHG emissions can be measured.  The first is the "Production-Based GHGE Accounting System" ("PAS"), and the second is the "Customer-Based GHGE Accounting System" ("CAS").  LOL testified that the PAS method determines "the greenhouse gas emissions at a power plant per BTU of power generated," while the CAS method determines "the embedded greenhouse gas emissions per BTU of power generated."  In other words, CAS takes into account greenhouse gases produced not simply upon the use of fuel (as PAS does), but also greenhouse gases produced upon making the fuel itself.  LOL asserted HG's "fuel has large, hidden emissions which distort the value of their fuel."  LOL stated that the PUC had yet to adopt any particular accounting methodology for measuring GHG emissions. It urged the PUC to adopt the CAS methodology.  LOL also asserted that the "participants would expect that they would have due process rights to review any other proposed system before its adoption."

## I.   Briefing on sub-Issue No. 1h

In June 2018, HG and the Consumer Advocate settled on a reasonable rate increase; therefore, the evidentiary hearing scheduled for that month was waived by the parties and

participants.  In lieu of an evidentiary hearing on the remaining sub-Issue No. 1h, HG and the participants agreed to file opening and reply briefs.[8]

In its opening brief, HG argued that the PUC should not disallow, as unreasonable, HG's LNG costs "due to the effects of HG's use of imported LNG on the State's reliance on fossil fuels and greenhouse gas emissions," because (1) the PUC "ha[d] already determined that HG's expenditures for LNG [we]re prudent and in the public interest in Docket Nos. 2014-0315 [30% SNG Conversion Project] and 2013-0184 [SNG Backup Enhancement Project]"; (2) HG's response to information request 49 was that its LNG projects would decrease GHG emissions; and (3) LOL and KLM did not introduce any contrary evidence and, instead, offered only generalized statements regarding broad policy issues.  In their joint reply brief, LOL and KLM counter-argued that HG "presented no data on life cycle emissions to substantiate [the] claim" that its two LNG projects would decrease GHG emissions, as it asserted in its response to information request 49.

In their joint opening brief, LOL and KLM cited MECO, 141 Hawaiʻi 249, 408 P.3d 1, to hold the PUC to its statutory obligation under HRS § 269-6(b) to consider the "hidden and long

_____

8    The Consumer Advocate, while a party, did not take a position on sub-Issue No. 1h.

term costs" of HG's LNG projects.  To that end, they called on the PUC to adopt the CAS methodology for measuring "life cycle" GHG emissions.  They noted, for example, that LNG fracked[9] out-of-state releases methane, which is "34 times stronger than [carbon dioxide] in trapping heat over a 100-year period and 86 times stronger over 20 years."  LOL and KLM also urged the PUC to fulfill its obligations under Hawai'i state constitutional provisions protecting (1) Hawai'i's natural resources, which are held in public trust, (2) the right to a clean and healthful environment, and (3) native Hawaiian traditional and customary rights.  LOL and KLM accused HG of recklessly expanding LNG use in Hawai'i without providing clear information about its GHG emissions.  In its reply brief, HG pointed out that it did not seek to expand the use of LNG; rather, the LNG projects had already been approved, and HG sought only to include those projects in its rate base.

**J.  PUC Decision and Order No. 35969**

On December 21, 2018, the PUC handed down its Decision and Order No. 35969.  It approved HG and the Consumer Advocate's stipulation upon settlement, granting HG an increase of $8,896,152, or approximately 8.39% over revenues at present rates . . . ."  The PUC specifically found that both the 30% SNG

---

[9]     The record does not indicate where or how HG's imported LNG is sourced.

18

Conversion Project and the SNG Backup Enhancement Project were "used and useful for public utilities purposes" and granted as "reasonable" the stipulated cost recovery for both projects. The PUC specifically found and concluded, "The [S]NG Backup Enhancement System increases the reliability of [HG's] SNG operations in the event of planned and unplanned SNG Plant outages, to the customers' benefit."  It also appeared to adopt, in its specific findings and conclusions, a prior "articulat[ion]" that the 30% SNG Conversion Project would increase Hawai'i's "fuel diversity" in two ways:  first, by diversifying the State's fuel supply by adding LNG; and, second, by diversifying the State's sources of fuel, because HG planned to purchase LNG from "two different suppliers through different ports in difference regions," in the event one supplier were to become unavailable.

The PUC's Decision and Order contains a separate section addressing sub-Issue No. 1h, titled "In Making Determinations of the Reasonableness of the Costs of Utility System Capital Improvements and Operations, the Commission Shall Explicitly Consider, Quantitatively or Qualitatively, the Effect of the State's Reliance on Fossil Fuels on Price Volatility, Export of Funds for Fuel Imports, and Fuel Supply Reliability Risk, and Greenhouse Gas Emissions," which tracks the language of HRS § 269-6(b).  The commission stated that it "explicit[ly]

consider[ered], weigh[ed], and balanc[ed] . . . the four specified criteria" before "find[ing] reasonable [HG's] 2018 Test Year LNG utility system capital improvements and operations costs." The PUC therefore "decline[d] to disallow [HG's] 2018 Test Year LNG costs." The PUC made "specific[] find[ings] and conclu[sions]" concerning the four specified criteria, grouping its analysis of "price volatility" and "fuel supply reliability risk" together, then addressing "export of funds for fuel imports," and "greenhouse gas emissions."

As to GHG emissions, the PUC appeared to adopt HG's representation that the 30% SNG Conversion Project and SNG Backup Enhancement Project would result in decreased GHG emissions:

> A. For the 30% [SNG] Conversion Project (i.e., Docket No. 2014-0315), greenhouse gas emissions associated with the SNG Plant's stationary equipment fuel use will decrease (i.e., reported to the EPA under Subpart C), while greenhouse gas emissions associated with LNG sold to customers (i.e., reported to the EPA under Subpart NN) will be nearly identical to displaced SNG; and
>
> B. For the [S]NG Backup Enhancement . . . Project (i.e., Docket No. 2013-0184), a similar displacing SNG with LNG principle will apply.
>
> 14. As [HG] specifically explains:
>
> Currently for the 30% [SNG] Conversion Project, which displaces quantities of SNG with LNG, greenhouse gas emissions associated with the SNG Plant's stationary equipment fuel use (reported to the EPA under Subpart C), would <u>decrease</u> due to the amount of SNG displaced with LNG. In other words, greenhouse gas emissions associated with SNG production would <u>decrease</u> because less SNG is produced. Greenhouse gas emissions associated with LNG sold to HG customers (reported to the EPA under Subpart NN) would be nearly identical to displaced SNG because LNG is chemically

20

> similar to the SNG produced at the SNG Plant.  The life of the 30% [SNG] Conversion Project has not been determined.
>
> Currently for the [SNG] Backup Enhancement Project, a similar displacement principle would be applicable. However, because the amount of vaporized LNG injected into the transmissions pipeline will vary according to the number and length of SNG Plant shutdowns, the actual amount is difficult to quantify.  For every therm of vaporized LNG injected into the pipeline to back up the SNG Plant, the total amount of greenhouse gas emissions would <u>decrease</u> due to the reduction in stationary equipment fuel necessary to create the displaced SNG.  The life of the [SNG] Backup Enhancement Project has not been determined.

The PUC then found and concluded, "Participants have not produced any credible evidence:  (A) which contradicts [HG's] evidence; or (B) that [HG's] use of LNG as part of its utility operations will increase greenhouse gas emissions."  The PUC continued, "Instead, Participants rely on general assertions, without credible evidentiary support, that [HG's] use of imported LNG will increase greenhouse gas emissions."

The PUC included a separate section in its Decision and Order titled "Commission's Response to the Legal Arguments Raised."  The PUC first concluded that "HRS § 269-6(b), by its plain language, does not mandate the [PUC's] adoption of the Customer-Based GHGE Accounting System (i.e. CAS) described by [LOL and KLM]."  Next, with respect to the Hawai'i State Constitution's rights to due process and to a clean and healthful environment, the PUC expressly acknowledged <u>MECO</u>'s holding that "HRS Chapter 269 is a law relating to environmental quality that defines the right to a clean and healthful

21

environment under article XI, section 9 of the Hawaii Constitution, by providing that express consideration be given to reducing greenhouse gas emissions in the [PUC's] decision-making (specifically citing to HRS § 269-6(b)). . . ."  The PUC also acknowledged <u>MECO</u>'s due process holding that a clean and healthful environment is a protected property interest, and that the PUC has "authority to set limitations in conducting the proceedings so long as the procedures sufficiently afford an opportunity to be heard at a meaningful time and in a meaningful manner on the issue of [a utility's proposed] impact on the asserted property interest."  The PUC then concluded that LOL and KLM were afforded an opportunity to be heard at a meaningful time and in a reasonable manner on sub-Issue No. 1h, due to their extensive participation in the rate case proceedings.  LOL and KLM timely appealed the PUC's Decision and Order.

## III.  Standards of review

### A.  Agency appeals

This court reviews appeals from PUC decisions under HRS § 91-14(g), which states the following:

> Upon review of the record, the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:
> (1) In violation of constitutional or statutory provisions;
> (2) In excess of the statutory authority or jurisdiction of the agency;
> (3) Made upon unlawful procedure;

(4) Affected by other error of law;
(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
(6) Arbitrary, or capricious, or characterized by abuse of direction or clearly unwarranted exercise of discretion.

Conclusions of law are reviewed de novo, pursuant to subsections (1), (2) and (4); questions regarding procedural defects are reviewable under subsection (3); findings of fact (FOF) are reviewable under the clearly erroneous standard, pursuant to subsection (5); and an agency's exercise of discretion is reviewed under the arbitrary and capricious standard, pursuant to subsection (6). Matter of Haw. Elec. Light Co., 145 Hawaiʻi 1, 10-11, 445 P.3d 673, 682-83 (2019) ("HELCO") (citation omitted). "Mixed questions of law and fact are '"reviewed under the clearly erroneous standard because the conclusion is dependent upon the facts and circumstances of the particular case."'" HELCO, 145 Hawaiʻi at 11, 445 P.3d at 683. (citation omitted).

## B. Statutory interpretation

We review the circuit court's interpretation of a statute de novo. State v. Pacheco, 96 Hawaiʻi 83, 94, 26 P.3d 572, 583 (2001). Our statutory construction is guided by established rules:

> When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

96 Hawai'i at 94, 26 P.3d at 583 (citations omitted).

## C. Constitutional law

Questions of constitutional law are reviewed de novo, under the right/wrong standard. Blair v. Harris, 98 Hawai'i 176, 178, 45 P.3d 798, 800 (2002).

## D. Agency rule-making

An agency possesses broad discretion to proceed by general rule-making or by adjudication. Application of Hawaiian Elec. Co., 81 Hawai'i 459, 467, 918 P.2d 561, 569 (1996). This court reviews for an abuse of discretion an agency's decision to proceed by adjudication rather than by rule-making.

## IV. Discussion

### A. LOL and KLM have standing to appeal the PUC's decision and order.

HG once again argues LOL and KLM lack standing to bring this appeal, contending they do not satisfy the traditional three-prong test for standing used in MECO, 141 Hawai'i 249, 408 P.3d 1: (1) injury in fact, (2) causation, and (3) redressability. LOL and KLM counter-argue that the applicable test for standing in administrative appeals is the two-prong test used in HELCO, 145 Hawai'i 1, 445 P.3d 673: (1) "one must be a person aggrieved . . . by a final decision and order in a contested case," and (2) "the aggrieved person must have

participated in the contested case from which the decision affecting him resulted."

The two-prong test for standing applies. MECO applied the traditional three-prong standing test on appeal because the appellants there challenged a PUC order denying them intervenor or participant status in the first instance. 141 Hawai'i at 256, 408 P.3d at 8. In this case, HG did not appeal the PUC's order granting LOL and KLM participant status. Rather, this is an appeal brought by LOL and KLM, who participated in the contested rate case and are aggrieved by the PUC's final decision and order. They are bringing an administrative appeal. Therefore, we apply the well-established two-prong standing test, most recently re-affirmed in HELCO, for intervenors or participants who are appealing final decisions and orders of the PUC. See also Life of the Land, Inc. v. Land Use Comm'n, 61 Haw. 3, 6, 594 P.2d 1079, 1081 (1979) (holding there are "two basic requirements" for standing to appeal an agency decision: "first, one must be a person aggrieved and second, the aggrieved party must have participated in a contested case."); Application of Hawaiian Elec. Co., 56 Haw. 260, 265, 535 P.2d 1102, 1106 (1975) ("[W]here the appellants have been 'aggrieved' by the action of the PUC, and where they were involved as 'participants' during the agency hearings, and where the PUC staff (the agency through which they participated at the

25

hearings) has failed to appeal the decision of the PUC, the appellants may challenge the order of the PUC in this court."); City & Cty. of Honolulu v. Pub. Utils. Comm'n., 53 Haw. 431, 433, 495 P.2d 1180, 1182 (1972) (per curiam) ("HRS § 91-14(a), which provides '(a)ny person aggrieved by a final decision and order in a contested case . . . is entitled to judicial review . . .', is clear and unambiguous that the person aggrieved must have been involved in the contested case before the PUC.").

In this case, Appellants have sufficiently alleged that the PUC's decision "specially, personally, and adversely affected" their members.  HELCO, 145 Hawai'i at 21, 445 P.3d at 693.  LOL is a Hawai'i nonprofit organization with members who live, work, and recreate in Hawai'i and are "deeply concerned" about the environmental and financial impacts of climate change in Hawai'i.  LOL asserts that sea level rise as a result of climate change and increased GHG emissions will result in over 20,000 Hawai'i residents in need of new homes and could "generate substantial social, infrastructure, and economic impacts with ripple effects throughout the State," which will invariably harm its members.  Similarly, KLM is a Hawai'i nonprofit dedicated to protecting native Hawaiian rights, with members who reside in Hawai'i and have an interest in protecting native Hawaiian

traditions and culture.  It asserts that the combined effects of climate change will adversely impact its members.  For example,

> saltwater intrusions into the freshwater aquifers, coastal erosion and rapid sea level rise [will] threaten[] the cultural practice of burying 'iwi kupuna along Hawai'i's shores, which prevents the 'uhane from joining the 'aumakua, interrupting the delicate balance between salt and fresh water in loko i'a, flooding and loss of burial grounds, home sites, fishponds, historic trails, heiau, and petroglyphs, the loss of salt cultivation, beach erosion, and contamination of crops and freshwater resources.

Thus, Appellants have demonstrated they are "persons aggrieved" who participated in the contested case; therefore, they have standing to appeal.

**B.   The PUC did not fulfill its statutory obligations under HRS § 269-6(b).**

Appellants argue the PUC failed to carry out its mandate under HRS § 269-6(b), which states the following (with emphases added):

> The public utilities commission shall consider the need to reduce the State's reliance on fossil fuels through energy efficiency and increased renewable energy generation in exercising its authority and duties under this chapter.  In making determinations of the reasonableness of the costs of utility system capital improvements and operations, the commission shall explicitly consider, quantitatively or qualitatively, the effect of the State's reliance on fossil fuels on price volatility, export of funds for fuel imports, fuel supply reliability risk, and greenhouse gas emissions.  The commission may determine that short-term costs or direct costs that are higher than alternatives relying more heavily on fossil fuels are reasonable, considering the impacts resulting from the use of fossil fuels.

First, the Appellants contend that the PUC's consideration of GHG emissions should not have been geographically limited to those emissions occurring within the State's borders.  Second,

the Appellants assert that the PUC's Decision and Order merely adopted, without substantiating, HG's representations in information request 49 that its LNG projects would result in decreased GHG emissions.

As to the Appellants' first point, HG and the PUC respond that the plain language of HRS § 269-6(b) does not require the PUC to consider GHG emissions beyond the State's borders.  As to the Appellants' second point, HG and the PUC counter-argue that the PUC made express findings on the GHG emissions issue in the section of its Decision and Order titled "Greenhouse Gas Emissions," and that HG's answer to information request 49 is the "only credible evidence in the record."

Appellants are correct.  In interpreting HRS § 269-6(b), we look to "the language contained in the statute itself," which must be read "in the context of the entire statute and construe[d] . . . in a manner consistent with its purpose." Pacheco, 96 Hawai'i at 94, 26 P.3d at 583 (citations omitted). We note that the plain language of HRS § 269-6(b) does not limit the PUC's consideration of GHG emissions to those only occurring within the state.  Also, elsewhere in the HRS, where the legislature has intended to limit consideration of certain GHG emissions, it plainly does so.  For example, HRS § 342B-71 (2010) sets a "[s]tatewide greenhouse gas emissions limit" at "equal to or below the level of the statewide greenhouse gas

emissions in 1990," but it specifically excludes "greenhouse gas emissions from airplanes." It is "generally presumed that the legislature acts intentionally and purposely in the disparate inclusion or exclusion" of terms in its statutes. State v. Savitz, 97 Hawaiʻi 440, 447, 39 P.3d 567, 574 (2002) (holding that the legislature could have drafted a statute to include a limitation on the court's discretion, and noting that "[t]he fact that it did not do so manifests its intent that it chose not to do so"). If the legislature intended HRS § 269-6(b) to exclude from the PUC's consideration GHG emissions generated out-of-state by imported fossil fuels, it would have done so.

We have also already extensively examined the purpose of HRS § 269-6(b), as amended, in MECO, 141 Hawaiʻi 249, 408 P.3d 1. In that case, we noted "a primary purpose" of the statute is to "require the [PUC] to consider the hidden and long-term costs of reliance on fossil fuels, which subjects the State and its residents to 'increased air pollution' and 'potentially harmful climate change due to the release of harmful greenhouse gases.'" MECO, 141 Hawaiʻi at 263, 408 P.3d at 15 (citing H. Stand. Comm. Rep. No. 1004, in 2011 House Journal, at 1332) (emphasis added)).

Appellants contend HG has quite literally "hidden" the GHG emissions impact of its imported LNG. The "hidden" GHG emissions impacts Appellants are concerned with include GHG

29

emissions from the extraction, development, production, and transportation of imported LNG, which occur out-of-state, but which, nonetheless, impact Hawai'i due to the global nature of GHG emissions.  We agree with this contention.[10]  In MECO, this court noted that "it is commonly understood that '[a]ir pollution is transient' and is 'heedless' of even 'state boundaries.'" 141 Hawai'i at 268, 408 P.3d at 20 (citing E.P.A. v. EME Homer City Generation, L.P., 134 S.Ct. 1584, 1592 (2014)).

Over a decade before we issued our MECO opinion, the legislature had already expressed its concern about the impact on Hawai'i of GHG emissions produced out-of-state.  In 2007, the legislature committed the state to reduce, by January 1, 2020,

___

[10]    We note the Appellants and HG touch on the Commerce Clause of the United States Constitution in their briefing.  Under the Commerce Clause, Congress has the power to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."  U.S. Const. art. I, § 8, cl. 3.  The Commerce Clause "has long been understood to have a 'negative' aspect that denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles in commerce."  Or. Waste Sys., Inc. v. Dep't of Envtl. Quality of State of Or., 511 U.S. 93, 98 (1994).

HG argues that interpreting HRS § 269-6(b) to take into account out-of-state GHG emissions produced by its imported LNG is extra-territorial legislation, and per se unconstitutional under Healy v. Beer Inst., 491 U.S. 324, 336 (1989), because it attempts to regulate GHG emissions beyond Hawai'i's borders.  Failing that, HG argues in the alternative that interpreting HRS § 269-6(b) this way violates the commerce clause under Pike v. Bruce Church, Inc., 397 U.S. 137 (1970), because the burden imposed on interstate commerce outweighs any putative local benefit to Hawai'i.

To the extent the dormant Commerce Clause is even implicated in this case, it is not violated.  HRS § 269-6(b) tasks the PUC only with explicitly "considering" GHG emissions from HG's imported LNG, not regulating GHG emissions extra-territorially.  Further, the burden associated with "considering" out-of-state GHG emissions is minimal compared to the local benefit at stake:  the constitutional protection of a clean and healthful environment.

"statewide greenhouse gas emissions to levels at or below the best estimations and updates of the inventory of greenhouse gas emissions estimates for 1990."  Act 234, H.B. 226, 24th Leg., Reg. Sess. (2007) (enacted), available at https://www.capitol.hawaii.gov/session2007/ bills/GM1005_.PDF, also available at https://perma.cc/TH44-RFPQ. To that end, Act 234 established the Greenhouse Gas Emissions Reduction Task Force "to prepare a work plan and regulatory scheme for implementing the maximum practically and technically feasible and cost-effective reductions in greenhouse gas emissions from sources or categories of sources of greenhouse gases to achieve the statewide greenhouse gas emissions limits by 2020."  Id.  The legislature specifically directed the Task Force to craft "[r]ecommendations to minimize 'leakage' or a reduction in emissions of greenhouse gases within the State that is offset by an increase in emissions of greenhouse gases outside the State. . . ."  Id. at PDF p. 11.  The Task Force's work plan, in turn, "strongly insist[ed] the life-cycle impact of energy sources be considered in any adopted energy laws," because "even though an energy technology may be relatively clean-burning within the boundaries of Hawaii, the process in which it is made elsewhere is also of importance."  The Greenhouse Gas Emissions Reduction Task Force, Work Plan for Greenhouse Gas Emissions Reductions 14 (Dec. 30, 2009),

http://energy.hawaii.gov/wp-content/uploads/2016/03/2015-greenhouse-gas-program.pdf, also available at https://perma.cc/5EZQ-LK9Z.  Thus, since Act 234, part of this state's GHG emission reduction strategy has included taking into account out-of-state GHG "leakage" resulting from our energy choices.[11]

In this rate proceeding, HG and the PUC have largely disregarded any possible GHG emission leakage from imported LNG. The PUC's geographic limitation in Order No. 35112 indicates that it did not intend to, and in fact did not, explicitly consider out-of-state LNG-related GHG emissions in discharging its duties under HRS § 269-6(b).  The PUC's action was contrary to law and, therefore, an abuse of discretion.

---

[11]    It is important to note that the EPA, California, and Oregon have all adopted, in some form, Argonne National Laboratory's "Greenhouse gases, Regulated Emissions and Energy use in Transportation" (or "GREET") Model, see https://greet.es.anl.gov/, also available at https://perma.cc/TQ7Q-XYGM, to calculate life-cycle GHG emissions.  See Rocky Mountain Farmers Union v. Corey, 730 F.3d 1070, 1081-82 (9th Cir. 2013) (explaining California's CA-GREET Model); Am. Fuel & Petrochemical Mfrs. v. O'Keeffe, 903 F.3d 903, 908-09 (9th Cir. 2018) (explaining Oregon's OR-GREET model); and Regulation of Fuels and Fuel Additives:  Renewable Fuel Standard Program ("RFS"), 72 Fed. Reg. 23900, 23907 (May 1, 2007) (codified at 40 C.F.R. pt. 80) (explaining how the EPA utilized GREET in calculating life-cycle GHG emissions for its RFS Program).  California's CA-GREET modeling can be found at https://ww2.arb.ca.gov/resources/documents/lcfs-pathway-certified-carbon-intensities, also available at https://perma.cc/U3VB-R898.  Oregon's OR-GREET modeling can be found by accessing the link for the "carbon intensity values" Excel worksheets located at https://www.oregon.gov/deq/aq/programs/Pages/Clean-Fuel-Pathways.aspx, also available at https://perma.cc/VLX9-AU3.  The EPA's RFS GREET modeling can be found at https://www.epa.gov/fuels-registration-reporting-and-compliance-help/lifecycle-greenhouse-gas-results, also available at https://perma.cc/647V-YVPA.  Thus, life-cycle GHG emission information is available to participants.  See also note 13, infra.

Next, the PUC's limited and perfunctory review of GHG emissions in this rate case is evident in the Greenhouse Gas Emissions section of its Decision and Order No. 35969.  Instead of making any independent factual findings concerning the GHG emissions of HG's LNG-related projects, the PUC simply repeated HG's representation (made in HG's response to the Appellants' information request 49) that GHG emissions from its SNG plant will decrease where LNG displaces SNG.  There is no GHG emissions information about the LNG HG uses.  Therefore, the PUC could not have fulfilled its "affirmative duty 'to reduce the State's reliance on fossil fuels through energy efficiency and increased renewable energy generation,'" as HRS § 269-6(b) requires, because the PUC could not have "'explicitly consider[ed]' the effect of the State's reliance on fossil fuels on the level of 'greenhouse gas emissions.'"  MECO, 141 Hawai'i at 269 n.36, 408 P.3d at 21 n.36 (emphasis added).

Further, as Appellants point out, the PUC did not conduct a "quantitative or qualitative analysis" that substantiates its finding that HG's LNG projects will decrease GHG emissions.  In this way, this case is closely analogous to HELCO, 145 Hawai'i 1, 445 P.3d 673.  In that case, HELCO sought the PUC's review of an amended power purchase agreement ("Amended PPA") between it and Hu Honua Bioenergy, LLC, in which Hu Honua would construct and operate a biomass-fueled energy production facility, and HELCO

would purchase energy from the facility.  145 Hawai'i at 5-6, 445 P.3d at 677-78.  LOL moved to intervene in order to assert its environmental interests in the project, but the PUC granted it participant status instead.  145 Hawai'i at 6, 445 P.3d at 678.  The PUC limited LOL's participation to addressing business aspects of the project (whether the energy price components properly reflect the cost of biomass fuel supply, and whether HELCO's purchase power arrangements were prudent and in the public interest); LOL's limited participation did not allow it to address environmental aspects of the project.  145 Hawai'i at 7, 445 P.3d at 679.  As a result, HELCO and Hu Honua refused to answer LOL's information requests concerning GHG emissions as beyond the scope of LOL's participation.  145 Hawai'i at 8, 445 P.3d at 680.

The PUC in HELCO ultimately approved the Amended PPA.  145 Hawai'i at 9, 445 P.3d at 681.  In its findings and conclusions, the PUC merely "restated HELCO's representations that the biomass facility could potentially save approximately 15,700 barrels of fuel per year and contribute to the State's [renewable portfolio standard] goals," but "it made no express findings or conclusions regarding the biomass facility's GHG emissions."  145 Hawai'i at 24, 445 P.3d at 696.  LOL appealed, arguing that the PUC did not explicitly consider GHG emissions

34

in determining whether the costs of the Amended PPA were reasonable, in violation of HRS § 269-6(b), and that it was denied due process to protect its right to a clean and healthful environment due to the PUC's limitation on its participation.  145 Hawaiʻi at 10, 445 P.3d at 682.

In HELCO, this court held that the PUC needed to do more than restate HELCO's representation about energy savings; instead, this court required the PUC to "substantiate this finding by addressing the hidden and long-term environmental and public health costs of reliance on energy produced at the proposed facility."  145 Hawaiʻi at 24, 445 P.3d at 696.  HELCO continued, "These costs include the 'potential for increased air pollution as a result of GHG emissions' directly attributed to energy generation at the facility, as well as GHG emissions produced at earlier stages in the production process, such as fuel production and transportation."  Id. (citing MECO, 141 Hawaiʻi at 263, 408 P.3d at 15).

The HELCO court further noted that "[a]n agency's findings should be 'sufficient to allow the reviewing court to track the steps by which the agency reached its decision.'"  HELCO, 145 Hawaiʻi at 11, 445 P.3d at 683.  Where they are not, a "remand pursuant to HRS § 91-14(g) is appropriate," as the "agency's findings are incomplete and provide no basis for review."  145

35

Hawaiʻi at 24, 445 P.3d at 696 (citations omitted).  In this case, the PUC similarly restated HG's representation that its LNG projects will decrease GHG emissions, but it did not substantiate those findings in a manner that would allow this court to track the steps by which it reached its decision.

The PUC contends that this case was just a rate case, and that the PUC had already fulfilled the requirements of HRS § 269-6(b) in the earlier dockets approving the LNG projects.  The PUC, however, specifically granted the Appellants participant status to address HRS § 269-6(b) with respect to GHG emissions.  Also, MECO stated that "HRS § 269-6(b)'s requirement to reduce reliance on fossil fuels and to consider greenhouse gas emissions applies to the fulfillment of all of the Commission's duties."  141 Hawaiʻi at 263, 408 P.3d at 15 (emphasis added).  See also MECO, 141 Hawaiʻi at 269, 408 P.3d at 21 ("[T]he consideration of whether energy charges are reasonable or a business arrangement is prudent would necessarily involve an evaluation of the hidden and long-term costs of the activities . . . , including consideration of the potential for harmful greenhouse gas emissions.").

In this case, the PUC did not fulfill the statutory requirements of HRS § 269-6(b) because (1) it did not explicitly consider all of the GHG emission impacts of HG's LNG projects,

having erroneously previously determined that the out-of-state

GHG emissions from HG's imported LNG were beyond the scope of

the rate proceeding, and, (2) upon considering the limited

evidence submitted in this case, merely restating, without

substantiating, HG's representation that its LNG projects would

decrease GHG emissions.

**C.   The PUC's limitations in sub-Issue No. 1h violated Appellants' due process rights**.

The Appellants argue that the PUC violated their due

process rights, under the Fifth Amendment to the United States

Constitution, as well as under article I, section 5 of the

Hawai'i State Constitution, by denying them a meaningful

opportunity to be heard.  "The basic elements of procedural due

process of law require notice and an opportunity to be heard at

a meaningful time and in a meaningful manner before governmental

deprivation of a significant property interest."  HELCO, 145

Hawai'i at 25, 445 P.3d at 697 (citations omitted).  Under MECO,

141 Hawai'i 249, 408 P.3d 1, Appellants possess a protected

property interest in a clean and healthful environment under

article XI, section 9 of the Hawai'i State Constitution, which

states:

> Each person has the right to a clean and healthful
> environment, as defined by laws relating to environmental
> quality, including control of pollution and conservation,
> protection and enhancement of natural resources.  Any
> person may enforce this right against any party, public or
> private, through appropriate legal proceedings, subject to
> reasonable limitations and regulation as provided by law.

37

HRS § 269-6(b) is a "law relating to environmental quality," and it requires the PUC to "explicitly consider, quantitatively or qualitatively, the effect of the State's reliance on fossil fuels on . . . greenhouse gas emissions."

Appellants acknowledge that MECO held that the PUC "has the authority to set limitations in conducting the proceedings so long as the procedures sufficiently afford an opportunity to be heard at a meaningful time and in a meaningful manner" in a proceeding before it, citing MECO, 141 Hawai'i at 270, 408 P.3d at 22. They point to HELCO, however, as a case in which the PUC's limitations deprived participants of a meaningful opportunity to be heard. Specifically, they state that this court in HELCO found a due process violation where the PUC limited participants to addressing two economic sub-issues, when the participants' asserted interest was environmental, not economic. Analogizing HELCO to their case, the Appellants argue that the PUC violated their due process rights by limiting the scope of sub-Issue No. 1h to exclude Appellants' interest in the full consideration of the GHG emission impact of HG's imported LNG.

The PUC counters that it framed sub-Issue No. 1h to "mirror" the language of HRS § 269-6(b); therefore, it argues, the Appellants' due process rights were not violated. Next,

both HG and the PUC argue that Appellants were afforded a meaningful opportunity to be heard in this rate proceeding, as Appellants participated extensively by submitting joint information requests, written testimony and exhibits, responses to HG's information requests, and opening and reply briefs on sub-Issue No. 1h.

In this case, as discussed supra, Section IV.B, the PUC limited its consideration of GHG emissions to those within the boundaries of the state, truncating Appellants' property interest in a manner not required under the plain language of HRS § 269-6(b), and in a manner contrary to MECO. See 141 Hawaiʻi at 268, 408 P.3d at 20 ("[I]t is commonly understood that '[a]ir pollution is transient' and is 'heedless' of even 'state boundaries.'") (citation omitted). In limiting the Appellants' constitutionally protected interest in this way, the PUC violated the Appellants' due process rights. See HELCO, 145 Hawaiʻi at 25-26, 445 P.3d at 697-98 (holding that the PUC's limitation upon LOL's participation to exclude its asserted interest in a clean and healthful environment violated LOL's due process rights). Therefore, the PUC's argument that it properly framed sub-Issue No. 1h to "mirror" HRS § 269-6(b) fails. Further, when the Appellants' interest is limited in this way, the "opportunities to be heard" cannot be said to be meaningful.

**D. The PUC did not abuse its discretion in adjudicating HG's rate case rather than proceeding through rule-making.**

Also at issue in this case is whether the PUC improperly created GHG emissions policy through the ad hoc adjudication of HG's rate case, where such policy should develop through the rule-making procedures of HRS chapter 91, Hawai'i's Administrative Procedure Act ("HAPA").[12] This court has previously explained the difference between rule-making and adjudication as follows: "Rule making is agency action governing the future conduct either of groups or persons or of a single individual; it is essentially legislative in nature. . . . Adjudication, conversely, is concerned with the determination of past and present rights and liabilities." Foster Vill. Cmty. Ass'n, 4 Haw. App. at 475-77, 667 P.2d at 857-58. The parties acknowledge that "agencies are allowed the broad discretion to choose whether to develop policy by rule-making or adjudication." In re Application of HECO, 81 Hawai'i

---

[12] HAPA was enacted "to provide a uniform administrative procedure for all state and county boards, commissions, departments or offices which would encompass the procedure of rule making and adjudication of contested cases." Foster Vill. Cmty. Ass'n v. Hess, 4 Haw. App. 463, 475, 667 P.2d 850, 857 (1983) (citation omitted). Chapter 91 contains procedures for state agencies to follow with respect to rule-making. HRS § 91-1 (2012) defines a rule as "each agency statement of general or particular applicability and future effect that implements, interprets, or prescribes law or policy, or describes the organization, procedure, or practice requirements of any agency." HRS § 91-3 (2012) requires an "adopting agency," "prior to the adoption of any rule authorized by law," to, among other things, "[g]ive at least thirty days' notice for a public hearing," and "[a]fford all interested persons opportunity to submit data, views, or arguments, orally or in writing."

at 468, 918 P.2d at 570 (citation omitted).  However, "policymaking by adjudication is an abuse of discretion if:  (1) it is used to 'circumvent the requirements of the Administrative Procedure Act' by amending a recently amended rule or bypassing a pending rule-making proceeding; or (2) 'an agency's sudden change of direction leads to undue hardship for those who had relied on past policy.'"  Id. (citation omitted).

In this case, only the second form of abuse of discretion is at issue, as there is no rule, recently amended rule, or pending rule-making proceeding concerning how the PUC shall measure GHG emissions.[13]  As to when an agency engages in a

---

[13]    We note other states, as well as the federal government, have developed rules for measuring GHG emissions using a life-cycle analysis, at least for transportation fuels.  See, e.g., Clean Air Act § 211(o), 42 U.S.C. § 7545(o)(1)(H) (2009) (defining "lifecycle greenhouse gas emission" as the "aggregate quantity of greenhouse gas emissions (including direct emissions and significant indirect emissions such as significant emissions from land use changes), as determined by the Administrator, related to the full fuel lifecycle, including all stages of fuel and feedstock production and distribution, from feedstock generation or extraction through the distribution and delivery and use of the finished fuel to the ultimate consumer, where the mass values for all greenhouse gases are adjusted to account for their relative global warming potential"); Cal. Code Regs. tit. 17, § 95481(a)(38) (2020) (defining "Life Cycle Greenhouse Gas Emissions" as "aggregate quantity of greenhouse gas emissions (including direct emissions and significant indirect emissions, such as significant emissions from land use changes), as determined by the Executive Officer, related to the full fuel life cycle, including all stages of fuel and feedstock production and distribution, from feedstock generation or extraction through the distribution and delivery and use of the finished fuel to the ultimate consumer, where the mass values for all greenhouse gases are adjusted to account for their relative global warming potential"); Or. Rev. Stat. § 468A.266(2)(b) (2018) (authorizing the Oregon Environmental Quality Commission to adopt "[s]tandards for greenhouse gas emissions attributable to the fuels throughout the lifecycles of the fuels, including but not limited to emissions from the production, storage, transportation and combustion of the fuels and from changes in land use associated with the fuels").

As indicated in note 11, supra, the EPA, California, and Oregon have all adopted models to calculate life-cycle GHG emissions.  We also note with

(continued. . .)

41

"sudden change of direction lead[ing] to undue hardship for those who had relied on past policy," two cases guide this court's inquiry: Application of Hawaiian Elec. Co., 66 Haw. 538, 669 P.2d 148 (1983) ("Lifeline Rates"), and In re Application of HECO, 81 Hawai'i 459, 918 P.2d 561. Both are cases in which this court held the PUC did not abuse its discretion by proceeding through adjudication rather than rule-making.

In Lifeline Rates, HECO initiated a rate case seeking to increase its rates. 66 Haw. at 539, 669 P.2d at 150. Two community groups intervened and asked the PUC to establish lifeline rates under a federal statute. Id. Thereafter, the PUC treated the case as a contested case, placing the burden of proof on intervenors, holding an evidentiary hearing, and entering detailed findings of fact and conclusions of law before declining to implement lifeline rates. 66 Haw. at 540, 669 P.2d

---

(continued . . .)
approval that the PUC has recently asked the Hawaii Natural Energy Institute ("HNEI") to "conduct a study to provide estimates for the lifecycle greenhouse gas (GHG) emissions of various energy products and production technologies in Hawaii," including SNG and LNG, to assist it in decision making under HRS § 269-6(b). The PUC asked HNEI to develop the "boundary conditions" to "explicitly identify processes to be included" in a life-cycle analysis, such as "mining, transportation of raw and finished materials, manufacturing, electricity production, and end-of-life disposal." Letter from James P. Griffin, Ph.D, chair of the PUC, et al. to Richard E. Rocheleau, Director of HNEI (Aug. 28, 2019), available at https://puc.hawaii.gov/wp-content/uploads/2019/08/08.28.19-Letter-to-Director-Rocheleau_Lifecycle-Analysis-Task-Force-Request.pdf, also available at https://perma.cc/38NK-MCWK.

at 150. The intervenors appealed, arguing "that the [PUC] should have somehow told them what they must prove." 66 Haw. at 540, 669 P.2d at 151. This court framed the intervenors' argument to be "that it was error for the [PUC] to proceed by way of a contested case hearing (although they did not object thereto) and that the [PUC] instead should have adopted rules pursuant to § 91-3, HRS." 66 Haw. at 541, 669 P.2d at 151.

This court affirmed the PUC's order and rejected the intervenors' argument as follows:

> In this case, the appellants accepted, without objection, the contested case procedure and, in fact, took their appeal based on statutes which provide for appeals from an "order" in a contested case. That being so, we will not here entertain their alternative contention that the "order" entered was instead a "rule" which should have been differently handled.
>
> Moreover, if what appellants desired was the promulgation of a "rule" by the PUC, they should have proceeded by petition for the adoption of such rule pursuant to § 91-6, HRS. The agency then would have been obliged within 30 days to either deny the petition, stating its reasons in writing for the denial, or initiate proceedings in accordance with § 91-3, HRS.

Id.

Similarly, in In re Application of HECO, this court again rejected community intervenors' argument on appeal that the PUC impermissibly engaged in rule-making in the guise of adjudicating a contested case. 81 Hawai'i 459, 918 P.2d 561. In that case, HECO applied to the PUC for permission to commit funds to construct high-voltage overhead transmission lines. 81 Hawai'i at 461, 918 P.2d at 563. The intervenors argued, among

43

other things, that the transmission lines should be placed underground.  81 Hawai'i at 463, 918 P.2d at 565.  In its Decision and Order, the PUC declined to require HECO to place its transmission lines underground,

> unless (1) there [was] a compelling reason (which outweighs the cost) to place the lines underground or (2) there is a stated public policy requiring the lines to be laid underground or (3) the ratepayers as a whole consent to bear the high cost of putting the lines underground. . . . That placing the transmissions lines overhead may obstruct one's view plane, in and of itself, is not sufficient cause to require the ratepayers to bear the cost of laying the lines underground.

81 Hawai'i at 464, 918 P.2d at 566.

The intervenors appealed, arguing that the "PUC violated HAPA by failing to properly promulgate rules to establish when transmission lines will be placed underground."  81 Hawai'i at 465, 918 P.2d at 567 (footnote omitted).  In other words, they argued "that what would qualify as 'additional justification' or criteria is clearly a statement of policy by the PUC, thereby requiring a rule-making proceeding prior to a contested case hearing under HAPA."  81 Hawai'i at 466, 918 P.2d at 568.

After analogizing the intervenor's case to Lifeline Rates, this court similarly concluded that no undue hardship existed, because (1) intervenors participated in the contested case without objection; (2) they took their appeal from the PUC's order pursuant to HRS §§ 91-14 and 269-16(f); (3) they should have proceeded by petition for the adoption of a rule under HRS

§ 91-6 if the promulgation of a rule was what they desired; (4) the contested case process afforded them extensive procedural opportunities to support their position; and (5) the PUC entered detailed findings of fact and conclusions of law.  In re Application of HECO, 81 Hawai'i at 470-71, 918 P.2d at 572-73 (footnotes omitted).

Similarly, in this case, the Appellants participated in the contested case format without objection (by filing their motions to intervene); took their appeal under statutes governing appeals of contested case orders issued by the PUC, HRS §§ 91-14 (2012 & Supp. 2016) and 269-15.5 (2007 & Supp. 2016); should have initiated a rule-making petition if that is what they desired (as it appeared in LOL's testimony early on that it sought to have the PUC adopt the CAS methodology for measuring GHG emissions); and were afforded the procedural benefits (though limited) of participating in a contested case, through the opportunities to, among other things, propound information requests to HG and to brief sub-Issue No. 1h.  Lastly, the PUC entered detailed findings of fact and conclusions of law.  Thus, under both Lifeline Rates and In re Application of HECO, the Appellants "cannot now be heard to complain that they suffered undue hardship" due to whatever perceived rule-making they believe the PUC engaged in.  81 Hawai'i at 471, 918 P.2d at 573

45

(footnote omitted).  In sum, the PUC did not abuse its

discretion in adjudicating HG's rate case.

**E.    Native Hawaiian traditional and customary rights**

The Appellants allege that the PUC did not fulfill its

constitutional obligation to protect KLM's native Hawaiian

customary and traditional rights under article XII, section 7 of

the Hawai'i Constitution, which provides the following:

> The State reaffirms and shall protect all rights,
> customarily and traditionally exercised for subsistence,
> cultural and religious purposes and possessed by ahupua'a
> tenants who are descendants of native Hawaiians who
> inhabited the Hawaiian Islands prior to 1778, subject to
> the right of the State to regulate such rights.

As indicated above, Appellants assert various impacts to native

Hawaiian cultural practices.

In Matter of Conservation District Use Application HA-3568,

143 Hawai'i 379, 431 P.3d 752 (2018) ("Mauna Kea II"), we

reaffirmed "the State's obligation to protect the reasonable

exercise of customary and traditionally exercised rights

of Hawaiians to the extent feasible."  143 Hawai'i at 395, 431

P.3d at 768, citing Public Access Shoreline Hawaii v. Hawai'i

Cty. Planning Comm'n, 79 Hawai'i 425, 450 n.43, 903 P.2d 1246,

1271 n.43 (1995).

Because the PUC improperly curtailed Appellants'

substantive participation, the record is not sufficiently

developed for us to address this issue.  On remand, the PUC should consider its constitutional obligations.

## F.  The State's public trust resources

Appellants also argue that the PUC failed to fulfill its affirmative obligations as a public trustee over the state's natural resources under article XI, section 1 of the Hawai'i State Constitution, which provides the following:

> For the benefit of present and future generations, the State and its political subdivisions shall conserve and protect Hawaii's natural beauty and all natural resources, including land, water, air, minerals and energy sources, and shall promote the development and utilization of these resources in a manner consistent with their conservation and in furtherance of the self-sufficiency of the State.
>
> All public natural resources are held in trust by the State for the benefit of the people.

As we reiterated in Mauna Kea II, a state agency must perform its functions in a manner that fulfills the State's affirmative obligations under the Hawai'i constitution.  143 Hawai'i at 387, 431 P.3d at 760.  We also note, however, that HG and the PUC's reliance on the ICA's decision in In re Molokai Pub. Utils., 127 Hawai'i 234, 277 P.3d 328 (App. 2012), to argue that a rate case does not trigger a state agency's public trust obligations where there is no change in use of the public trust resource, is misplaced.  That case was effectively overruled by this court's decision in Ching v. Case, 145 Hawai'i 148, 177–78, 449 P.3d 1146, 1175–76 (2019), in which we held that the state has a continuing duty to monitor the use of trust property, even

if the use of the property has not changed.  See also Lāna'ians for Sensible Growth v. Land Use Comm'n, 2020 WL 2511131, at *7 (Haw. May 15, 2020) (noting that the LUC possesses a continuing constitutional obligation to ensure that measures it imposes to protect public trust resources are implemented and complied with).  Thus, the PUC's constitutional obligations are ongoing, regardless of the nature of the proceeding.

Again, because the PUC improperly curtailed Appellants' substantive participation, the record is not sufficiently developed for us to address this issue.  On remand, the PUC should consider its constitutional obligations.

### V.  Conclusion

For the foregoing reasons, we vacate the PUC's Decision and Order No. 35969 and remand this case to the PUC for further proceedings consistent with this opinion.

| | |
|---|---|
| Lance D. Collins<br>for Appellants | /s/ Mark E. Recktenwald |
| | /s/ Paula A. Nakayama |
| David Y. Nakashima<br>(Jeffrey T. Ono and<br>John E. Dubiel with him<br>on the briefs)<br>for Appellee Hawai'i Gas | /s/ Sabrina S. McKenna<br><br>/s/ Richard W. Pollack |
| Andrew D. Goff<br>(Clare E. Connors and<br>Bryan C. Yee with him<br>on the briefs)<br>for Appellee Public<br>Utilities Commission | |

